# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Freddie Eugene Owens, Brad Keith Sigmon, Gary DuBose Terry, and Richard Bernard Moore, Respondents-Appellants,

v.

Bryan P. Stirling, in his official capacity as the Director of the South Carolina Department of Corrections; South Carolina Department of Corrections; and Henry McMaster, in his official capacity as Governor of the State of South Carolina, Appellants-Respondents.

Appellate Case No. 2022-001280

―――――――――

Appeal from Richland County
Jocelyn Newman, Circuit Court Judge

―――――――――

Opinion No. 28222
Heard January 5, 2023 and February 6, 2024

Filed July 31, 2024

―――――――――

**REVERSED**

―――――――――

Senior Legal Counsel William Grayson Lambert, Chief Legal Counsel Thomas Ashley Limehouse Jr., and Deputy Legal Counsel Erica Wells Shedd, all of Columbia, for Appellant-Respondent Governor Henry McMaster; Daniel Clifton Plyler, Austin Tyler Reed, and Frederick Newman Hanna, Jr., all of Smith Robinson, of Columbia, for Bryan P. Stirling, Director, and the South Carolina Department of Corrections, Appellants-Respondents.

John H. Blume, III, of Ithaca, NY; Lindsey Sterling Vann, Emily C. Paavola, Breedan Matthew Van Winkle, and Allison Ann Franz, all of Justice 360; John Christopher Mills, of J. Christopher Mills, LLC, all of Columbia; and Joshua Snow Kendrick, of Kendrick & Leonard, P.C., of Greenville, for Respondents-Appellants.

John Laffitte Warren, III, of Law Offices of Bill Nettles, of Columbia, for Amicus Curiae Concerned Public Health Professionals, Scientists, Former Regulators, and Educators. Howard Walton Anderson, III, of Truluck Thomason LLC, of Greenville, for Amicus Curiae Pharmaceutical Manufacturers.

---

**JUSTICE FEW:** This is a challenge by four condemned inmates to the constitutionality of section 24-3-530 of the South Carolina Code (Supp. 2023), which sets forth three alternative methods by which the State of South Carolina may carry out the inmates' death sentences. The inmates do not contend the section violates the Constitution of the United States. We hold section 24-3-530 does not violate the South Carolina Constitution.

## I.     Background

The death penalty for murder has been an important part of our criminal justice system since the founding of South Carolina as a colony in 1670. As the four inmates point out in their brief, "For most of South Carolina's history, executions were carried out by hanging." In 1912, joining a national trend toward a less inhumane manner of executing an inmate, South Carolina adopted electrocution as the sole method of carrying out the death penalty. Act No. 402, 1912 S.C. Acts 702, 702 (codified at S.C. Code Ann. § 24-3-530 (1976)). In 1995, South Carolina joined the next national trend seeking to make executions less inhumane—this time the trend toward lethal injection—and amended section 24-3-530 to provide, "A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection . . . ." Act No. 108, 1995 S.C. Acts 695, 696. The 1995 version of section

24-3-530 was in effect for the trials and death sentences of each of the four inmates in this case.[1]

Beginning in the late 2000s, however, it became increasingly difficult for South Carolina and other states to acquire the drugs necessary to carry out the death penalty by lethal injection. The Supreme Court of the United States explained that this "practical obstacle" to the use of lethal injection resulted "as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." *Glossip v. Gross*, 576 U.S. 863, 869-70, 135 S. Ct. 2726, 2733, 192 L. Ed. 2d 761, 769 (2015). The inability to obtain the drugs brought capital punishment to a halt in South Carolina because the 1995 version of section 24-3-530 made lethal injection the default method of execution.[2] This allowed an

---

[1] One of the inmates in this case committed his crime in 1994. *State v. Terry*, 339 S.C. 352, 354, 529 S.E.2d 274, 275 (2000). The other three inmates committed their crimes after 1995 when Act 108 was enacted. For the facts and procedural history of each inmate's case, see *State v. Owens*, 346 S.C. 637, 552 S.E.2d 745 (2001), *overruled in part by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005); *State v. Owens*, 362 S.C. 175, 607 S.E.2d 78 (2004); *State v. Owens*, 378 S.C. 636, 664 S.E.2d 80 (2008); *Owens v. Stirling*, 967 F.3d 396 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2513, 209 L. Ed. 2d 547 (2021); *State v. Sigmon*, 366 S.C. 552, 623 S.E.2d 648 (2005), *cert. denied*, 548 U.S. 909, 126 S. Ct. 2932, 165 L. Ed. 2d 959 (2006); *Sigmon v. State*, 403 S.C. 120, 742 S.E.2d 394, *cert. denied*, 571 U.S. 1028, 134 S. Ct. 646, 187 L. Ed. 2d 428 (2013); *Sigmon v. Stirling*, 956 F.3d 183 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1094, 208 L. Ed. 2d 545 (2021); *State v. Terry*, 339 S.C. 352, 529 S.E.2d 274, *cert. denied*, 531 U.S. 882, 121 S. Ct. 197, 148 L. Ed. 2d 137 (2000); *Terry v. State*, 394 S.C. 62, 714 S.E.2d 326 (2011), *cert. denied*, 565 U.S. 1206, 132 S. Ct. 1548, 182 L. Ed. 2d 179 (2012); *Terry v. Stirling*, 854 F. App'x 475 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 745, 211 L. Ed. 2d 497 (2022); *State v. Moore*, 357 S.C. 458, 593 S.E.2d 608 (2004); *Moore v. Stirling*, 952 F.3d 174 (4th Cir.), *cert. denied*, 141 S. Ct. 680, 208 L. Ed. 2d 285 (2020); *Moore v. Stirling*, 436 S.C. 207, 871 S.E.2d 423 (2022).

[2] In a prior opinion in this case, we explained that under the 1995 version, "section 24-3-530 provided any person sentenced to the penalty of death had a 'right of election' to select either lethal injection or electrocution as the method of execution. In the event the right of election was waived, the statute designated lethal injection as the default method . . . ." *Owens v. Stirling*, 438 S.C. 352, 355, 882 S.E.2d 858, 859 (2023) (citations omitted).

inmate to effectively prevent his execution by electing lethal injection, or by simply declining to elect, because the unavailability of the necessary drugs rendered it impossible for the State to carry out the inmate's sentence of death.

"Until recently," according to the State's brief, South Carolina "had, for almost a decade, been unable to obtain the drugs necessary to carry out an execution by lethal injection." According to our research, South Carolina has not executed anyone by lethal injection since 2009. In 2021, in an effort to address the unavailability of the necessary drugs, and yet enable the State to carry out the sentence of death for inmates upon whom that sentence was lawfully imposed, our General Assembly again amended section 24-3-530, this time to permit condemned inmates a choice between three alternative methods of execution. Act No. 43, 2021 S.C. Acts 163, 164. Act 43 added subsection 24-3-530(A), which provides, "A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the convicted person, by firing squad or lethal injection, if it is available at the time of election . . . ." S.C. Code Ann. 24-3-530(A) (Supp. 2023). The subsection provides that after a condemned inmate is served with a notice of execution, his "election for death by electrocution, firing squad, or lethal injection must be made in writing fourteen days before [the] execution date or it is waived. . . . If the convicted person waives the right of election, then the penalty must be administered by electrocution." *Id.*

Act 43 became effective on May 14, 2021. 2021 S.C. Acts at 165. On May 27 and June 1, 2021, the Clerk of this Court—fulfilling the ministerial responsibility set forth in section 17-25-370 of the South Carolina Code (2014)—issued a Notice of Execution in Sigmon's and Owens's cases, respectively. On June 11, the Director of the Department of Corrections—Appellant-Respondent Stirling—filed an affidavit with this Court stating, "I hereby certify that, as of this date, the only statutorily approved method of execution available . . . is electrocution." In a June 8 letter attached to the affidavit, Stirling explained, "As to lethal injection, the . . . Department of Corrections has been unable, despite numerous and diligent attempts, to acquire the drugs necessary, in usable form, to perform a lethal injection." Stirling continued, "As for firing squad, [the Department] does not currently have the necessary policies and protocols, as required by the statute, for an execution by firing squad."

On June 16, 2021, this Court entered a stay of execution in both cases and directed our Clerk "not to issue another execution notice until the State notifies the Court that the Department of Corrections . . . has developed and implemented appropriate protocols and policies to carry out executions by firing squad." On March 18, 2022,

Stirling wrote the Attorney General asking that he notify this Court "the Department of Corrections . . . has developed and implemented the appropriate protocols and policies to carry out executions by firing squad." On April 7, our Clerk issued a Notice of Execution in Moore's case. We later issued a stay of that Notice of Execution.

## II.     Procedural History

On May 17, 2021—shortly after the enactment of Act 43—Owens and Sigmon brought this declaratory judgment action in circuit court challenging the constitutionality of section 24-3-530. Terry and Moore joined the action later. At the direction of this Court, the circuit court conducted a trial in August 2022. Stirling remained unable to obtain the drugs at the time of trial. At the beginning of trial, the circuit court denied the inmates' discovery request "asking the State to supply discovery information describing the State's efforts to obtain the drugs needed for lethal injection." *Owens v. Stirling*, 438 S.C. 352, 356-57, 882 S.E.2d 858, 860 (2023). At the conclusion of trial, the circuit court ruled the Act unconstitutional. 438 S.C. at 358, 882 S.E.2d at 861. "Specifically, the court declared that (1) carrying out executions by either firing squad or electrocution violates the prohibition on the infliction of cruel, corporal, or unusual punishment in article I, section 15 of the South Carolina Constitution; (2) . . . the 'right to elect' his method of execution when alternatives are deemed 'available' . . . is unconstitutionally vague and an improper delegation of authority; (3) the lack of constitutional alternatives violates the statute; and (4) the retroactive application of the amended statute violates . . . ex post facto prohibitions . . . ." *Id.*

On appeal, this Court reversed the discovery ruling, remanded that issue to the circuit court, and held "the remainder of the appeal in abeyance pending the circuit court's resolution of the discovery issue." 438 S.C. at 354, 882 S.E.2d at 859.

While the case was on remand to the circuit court, our General Assembly enacted and the Governor signed Act 16 of 2023, 2023 S.C. Acts 41, which amended section 24-3-580 of the South Carolina Code (Supp. 2022) to, among other things, forbid the disclosure of any information regarding the State's acquisition of drugs for use in carrying out an execution by lethal injection. The parties refer to the amended section as the "shield statute." S.C. Code Ann. § 24-3-580 (Supp. 2023). The shield statute took effect on May 12, 2023. 2023 S.C. Acts at 46. On May 17, the State made a motion in this Court "to stay the circuit court proceedings following the Court's remand order . . . to give the Department of Corrections time to try to obtain lethal injection drugs with the benefit of" of the shield statute. With the inmates'

consent, we entered an order on June 8 to "stay the proceedings below" until further notice.

On September 19, the State notified this Court, "Once [the Department of Corrections] had the benefit of the shield statute, [the Department] was able to secure the drugs needed for carrying out an execution by lethal injection." The State then filed a motion with this Court to lift the abeyance of the appeal, dismiss the case, and "direct [our] Clerk to issue notices of execution under section 17-25-370." In an order entered October 31, we denied the motion to dismiss, lifted the abeyance, vacated the remand to circuit court, and set the case for February 6, 2024 to "rehear arguments on the merits" of all remaining issues.

### III. Standard for Decision

Our standard for decision when considering the constitutionality of a statute requires that we presume the statute is constitutional; we must uphold the statute unless we find beyond a reasonable doubt it does not conform to the constitution. *See Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999) ("A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution."); *Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 435, 181 S.E. 481, 484 (1935) ("A statute will, if possible, be construed so as to render it valid;" and "a legislative Act will not be declared unconstitutional unless its repugnance to the Constitution is clear and beyond reasonable doubt;" and "every presumption will be made in favor of the constitutionality of a legislative enactment"); *Thomas v. Macklen*, 186 S.C. 290, 305, 195 S.E. 539, 545 (1938) ("[W]e are not unmindful that it is a grave matter to overturn, by judicial construction, an enactment of the General Assembly. All presumptions are in favor of the power of that body to enact the law. All considerations involving the wisdom, the policy, or the expediency of the Act are addressed exclusively to that branch of the State government. . . . But when the unconstitutionality of an Act is clear to this Court, beyond a reasonable doubt, then it is its plain duty to say so."). The party challenging the constitutionality of a statute must prove it is unconstitutional. *Powell v. Keel*, 433 S.C. 457, 461, 860 S.E.2d 344, 346 (2021).

As to factual questions on which the constitutionality of the legislation may depend, we defer to the factual findings of the General Assembly. *Richards v. City of Columbia*, 227 S.C. 538, 560-61, 88 S.E.2d 683, 694 (1955). In optimal circumstances, the General Assembly will make express findings of the facts necessary to support the legislation. *See, e.g., Bauer v. S.C. State Hous. Auth.*, 271

S.C. 219, 230, 223, 246 S.E.2d 869, 875, 871 (1978) (noting the General Assembly made express findings of fact that some citizens "are suffering from a shortage of safe and sanitary housing which they can afford" in support of Act 76 of 1977 which "empowers the [State Housing] Authority to engage in a variety of programs designed to provide affordable 'sanitary and safe residential housing' for persons and families of low and low to moderate income"). As we observed in *Richards*, however, the General Assembly does not always make express factual findings in support of legislation. We stated, "there are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment." *Richards*, 227 S.C. at 561, 88 S.E.2d at 694.[3]

Legislative findings—express or presumed—are subject to judicial review, "and the court may consider extrinsic evidence for this purpose." *Id.* In this case, the circuit court made its own findings of fact based on evidence presented at trial. When the circuit court considers extrinsic evidence and makes factual findings for the purpose of determining the constitutionality of a statute, we will respect the circuit court's findings, as it was that court which heard the evidence first-hand. However, we will not defer to the circuit court's findings regarding facts necessary to support the legislation simply because there is some evidence to support the findings. *Cf. State v. Frasier*, 437 S.C. 625, 633-34, 879 S.E.2d 762, 766 (2022) (acknowledging the long-standing principle that "we review the trial court's factual findings for any evidentiary support" when considering whether law enforcement has violated the Fourth Amendment).

In *Frasier* and many other cases involving a criminal defendant's request to suppress evidence based on alleged unconstitutional police action—as opposed to the constitutionality of legislative action in enacting a statute—we have repeatedly held we will defer to circuit court findings of fact, so long as they are supported by some evidence. *See, e.g., Frasier*, 437 S.C. at 632, 879 S.E.2d at 765 ("Historically, we have repeatedly noted that appellate courts review an appeal from a motion to

---

[3] *See also State v. Malloy*, 95 S.C. 441, 450, 78 S.E. 995, 998 (1913) (regarding the humanity, and in turn the constitutionality, of electrocution, stating—but not ourselves holding—"the Courts were bound to presume that the legislature was possessed of the facts upon which it took action" (citing *People ex rel. Kemmler v. Durston*, 24 N.E. 6, 9 (N.Y. 1890))), *aff'd*, 237 U.S. 180, 35 S. Ct. 507, 59 L. Ed. 905 (1915).

suppress based on a violation of the Fourth Amendment under the deferential 'any evidence' standard."); *State v. Miller*, 441 S.C. 106, 119, 893 S.E.2d 306, 313 (2023) (holding "the trial court's factual findings regarding voluntariness" of a confession are reviewed "for any evidentiary support"). In *State v. Jones*, 440 S.C. 214, 891 S.E.2d 347 (2023), *cert. denied*, 144 S. Ct. 1012, 218 L. Ed. 2d 176 (2024), for example, we reviewed the trial court's factual finding regarding the purpose for a highway checkpoint conducted by law enforcement officers. 440 S.C. at 238-39, 891 S.E.2d at 359-60. We upheld the trial court's factual finding that "the primary purpose of the . . . checkpoint was highway safety, not general crime prevention" because there was evidence to support the finding. 440 S.C. at 240, 891 S.E.2d at 361. In *Frasier*, *Miller*, *Jones*, and the many other cases in which we applied this "any evidence" standard for reviewing factual findings, the findings related to the unique facts of that individual case—who did what, when, where, for what purpose, and to whom.

The trial court's factual findings in this case are different. The findings in this case do not relate to the unique facts of these cases, which facts all became final over the course of the litigation cited above in note 1. The circuit court's findings here relate, rather, to facts—primarily medical and scientific in nature—that are universally true or untrue. They are what the law calls "legislative facts."[4] For example, the extent to which electrocution or the firing squad pose a risk of unnecessary and excessive pain to a condemned inmate does not differ from Owens's case to Sigmon's, Terry's, or Moore's, nor will the risk of such pain vary from an execution in South Carolina to one in Utah or Idaho. The trial court's findings on the medical and scientific factual issues in this case, therefore, do not fit within the category of factual findings we addressed in *Frasier*, *Miller*, *Jones*, and other cases.

In a challenge to the constitutionality of a statute, it is legislative findings—to the extent they are expressed or may be fairly presumed—to which the law requires we defer, not circuit court findings. *Richards*, 227 S.C. at 560-61, 88 S.E.2d at 694. That deference requires the courts to uphold legislative findings unless they are

_____

[4] "Legislative facts . . . are the factual grounds on which judges base their opinions 'when deciding upon the constitutional validity of a statute . . . .'" Rule 201, SCRE note (quoting C. McCormick, MCCORMICK ON EVIDENCE 331 (4th ed. 1992)). They are distinguished from "adjudicative facts," which are "'facts about the particular event which gave rise to the lawsuit and . . . [help] explain who did what, when, where, how and with what motive and intent.'" *Id.* (quoting McCormick, *supra*, at 328).

"clearly erroneous." 227 S.C. at 561, 88 S.E.2d at 694; *see also Bauer*, 271 S.C. at 230, 246 S.E.2d at 875 (upholding legislative findings of fact because we were "unable to say from their face that they are 'clearly wrong'" (quoting *McNulty v. Owens*, 188 S.C. 377, 383, 199 S.E. 425, 428 (1938))).  When considering whether legislative findings are clearly erroneous—and thus whether the findings are entitled to deference—this Court will consider all the evidence before us, including any express or presumed legislative findings, the circuit court's findings, and the testimony and evidence upon which both legislative and judicial findings were made.  This Court will then determine whether it is possible—in light of all the evidence and the applicable law—to find the legislation is constitutional.  *See Clarke*, 177 S.C. at 435, 181 S.E. at 484 ("A statute will, if possible, be construed so as to render it valid.").  As to any facts the law requires the party challenging the statute to prove, *see Powell*, 433 S.C. at 461, 860 S.E.2d at 346, this Court will determine whether the challenging party has met its burden of proof.

As in all instances, we review the circuit court's legal and constitutional conclusions with no deference to the circuit court.  *See Callawassie Island Members Club, Inc. v. Dennis*, 425 S.C. 193, 198, 821 S.E.2d 667, 669 (2018) ("We review questions of law de novo."); *Frasier*, 437 S.C. at 633-34, 879 S.E.2d at 766 (holding constitutional questions are questions of law which we review de novo).

## IV.    Article I, Section 15

We turn now to the merits of the inmates' contention that section 24-3-530 is unconstitutional.  We begin in section IV.A with their argument that "article I, section 15 of the South Carolina Constitution is more protective than the Eighth Amendment."  We then analyze in sections IV.B, IV.C, and IV.D the constitutionality of the individual methods of execution set forth in section 24-3-530, beginning with electrocution, then lethal injection, then the firing squad.[5]  We

---

[5] In their brief to this Court, the inmates contend the circuit court correctly found the electrocution and firing squad provisions of section 24-3-530 violate the ex post facto provisions of the federal and South Carolina constitutions.  U.S. CONST. art. I, § 9; S.C. CONST. art. I, § 4.  They concede, however, "If it turns out that the drug [the Department of Corrections] has obtained is in fact pentobarbital from a legitimate source and of adequate quality, . . . this claim would fail."  The claim fails in any event.  The Supreme Court has stated the ex post facto provisions were not intended "to obstruct mere alteration in conditions deemed necessary for the orderly infliction of humane punishment." *Malloy v. South Carolina*, 237 U.S. 180, 183, 35 S. Ct. 507, 508, 59 L. Ed. 905, 906 (1915); *see also* 237 U.S. at 185, 35 S. Ct. at 509,

will then address in section V.A the inmates' argument that the use of the word "available" in section 24-3-530 renders the statute unconstitutional, and in section V.B we address the inmates argument that they are entitled to "some basic facts about the drugs' creation, quality, and reliability," or as their counsel described it at oral argument, the "potency, purity, and stability" of the drugs. Finally, in section VI, we analyze the constitutionality of section 24-3-530 as a whole, focusing on the constitutional significance of choice.

## A

Article I of the South Carolina Constitution is entitled "Declaration of Rights" and section 15 is entitled "Right of bail; excessive bail; cruel or unusual or corporal punishment; detention of witnesses." The text of the section provides, in part, "Excessive bail shall not be required, . . . nor shall cruel, nor corporal, nor unusual punishment be inflicted . . . ." The inmates argue the use of the disjunctive phrase "nor shall cruel, nor corporal, nor unusual" in article I, section 15—as opposed to the conjunctive phrase "nor cruel and unusual punishments inflicted" in the Eighth Amendment to the United States Constitution—indicates the framers of the South Carolina Constitution intended to provide "more protection than its federal counterpart." The State does not seriously challenge the argument, stating in its brief, "Indeed, no one disputes that article I, section 15 includes 'corporal' and uses 'or' while the Eighth Amendment does not include 'corporal' and uses 'and.'"

In several cases—despite this textual difference—this Court has used the Supreme Court of the United States' analysis of the Eighth Amendment as a guide to interpreting article I, section 15. *See, e.g.*, *State v. Wilson*, 306 S.C. 498, 512, 413 S.E.2d 19, 27 (1992) ("Despite this difference in verbiage, we note that the United States Supreme Court effectively treats the 'and,' as an 'or' in their Eighth Amendment analysis."); *id.* ("Thus, the use of the disjunctive 'or' rather than 'and' in the South Carolina Constitution is of no importance in this case, since the analysis we employ is the same under both constitutions."); *State v. Brown*, 284 S.C. 407, 411, 326 S.E.2d 410, 412 (1985) ("Article I, § 15, of our Constitution prohibits the

---

59 L. Ed. at 907 ("The statute under consideration did not change the penalty—death—for murder, but only the mode of producing this . . . . The punishment was not increased . . . ."). The inmates were sentenced to be executed, and they are still sentenced to be executed. There is no ex post facto violation. *See Weaver v. Graham*, 450 U.S. 24, 32 n.17, 101 S. Ct. 960, 966 n.17, 67 L. Ed. 2d 17, 25 n.17 (1981).

infliction of cruel and unusual punishment."); *State v. Allen*, 266 S.C. 175, 187, 222 S.E.2d 287, 292 (1976) (interpreting "the language of Article 1, Section 15" as prohibiting "cruel and unusual punishment"),[6] *vacated on other grounds*, 432 U.S. 902, 97 S. Ct. 2944, 53 L. Ed. 2d 1074 (1977), *and overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

We decline to determine the extent to which article I, section 15 provides "more protection" than the Eighth Amendment because in this case the inmates made no Eighth Amendment claim.  It is unnecessary, therefore, that this Court compare the two provisions.   In the analysis that follows—pursuant to the text of *our* constitutional provision—we proceed to determine whether section 24-3-530 or any of the specific provisions within it "inflict" either "cruel," "corporal," or "unusual" punishment.  If section 24-3-530 does any one of these, we must find the section unconstitutional.

**B**

We have not had the opportunity to determine the constitutionality under the South Carolina Constitution of any particular method of carrying out the death penalty.  In *State v. Shaw*, 273 S.C. 194, 255 S.E.2d 799 (1979), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991), however—a case in which article I, section 15 was not expressly argued—we stated, "The argument that the use of electrocution as a means of inflicting the death penalty constitutes cruel and unusual punishment has been decided adversely to appellants by the United States Supreme Court . . . ."  273 S.C. at 206, 255 S.E.2d at 805 (citing *In re Kemmler*, 136 U.S. 436, 447-48, 10 S. Ct. 930, 933-34, 34 L. Ed. 519, 524 (1890)).  In *Allen*, we upheld the constitutionality of the death penalty against an article I, section 15

---

[6] In *Allen*, we addressed the argument "that capital punishment constitutes 'cruel, corporal, or unusual punishment' and is therefore unconstitutional . . . under Article 1, Section 15 of the South Carolina Constitution."  266 S.C. at 186, 222 S.E.2d at 292.  We noted the language of article I, section 15 differs from former article I, section 19, which used "cruel and unusual punishment."  266 S.C. at 187, 222 S.E.2d at 292.  We explained that we had "considered this issue on no less than four occasions under Article 1, Section 19," and "[o]n each occasion, the constitutionality of capital punishment was upheld." 266 S.C. at 186-87, 222 S.E.2d at 292.  We stated, "The reasoning upon which the foregoing decisions were based is as directly applicable to Article 1, Section 15 as it was to Article 1, Section 19," and, "We adhere to those decisions."  266 S.C. at 187, 222 S.E.2d at 292.

challenge, but did not consider the constitutionality of electrocution as a method of carrying it out.  266 S.C. at 186-87, 222 S.E.2d at 292.  Because we did not address article I, section 15 in *Shaw* and we did not consider electrocution in *Allen*, we now consider for the first time the constitutionality under article I, section 15 of the South Carolina Constitution of carrying out the death penalty by electrocution.

**i**

We start with the article I, section 15 prohibition on "corporal" punishment and quickly dispense with the notion that any manner of carrying out the death penalty is corporal punishment.

The term "corporal" in relation to "punishment" has never had a precise meaning.[7] Originally, the term "corporal" meant in this context something along the lines of physical punishment intended to reform or rehabilitate *the person punished* as to his own future behavior.  Sir William Blackstone explained this point in his *Commentaries on the Laws of England* in 1769, stating "all corporal punishments . . . are inflicted" for the purpose of "the amendment of the offender himself." 4 WILLIAM BLACKSTONE, COMMENTARIES *11.  Sir Blackstone distinguished corporal punishment from other punishments that are imposed for the purpose of (1) "deterring others by the dread of his example from offending in the like way," or (2) "depriving the party . . . of the power to do further mischief" by executing or imprisoning him.  4 BLACKSTONE at *11-12.

The three purposes of punishment Sir Blackstone discussed in this passage are consistent with what we would today call (1) reform or rehabilitation, (2) general deterrence, and (3) specific deterrence.  Corporal punishment is primarily for the purpose of reform or rehabilitation, and of that broad category, corporal punishment is only physical punishment, or punishment that pertains to or relates to the body,[8]

---

[7] We frequently turn to Black's Law Dictionary for the meaning of legal terms.  In this instance, however, Black's is not helpful, as it defines the term "corporal punishment" so broadly as "including imprisonment."  *Punishment*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Obviously, article I, section 15 does not prohibit imprisonment.

[8] *See* William C. Anderson, A DICTIONARY OF LAW 260 (Chicago, T.H. Flood & Co. 1891) (defining 'corporal' as "Relating to the body of a person; bodily: as, corporal punishment").

and that serves the purpose to reform or rehabilitate the offender so that *he* will not commit the crime again. *See, e.g.*, *State v. Hamblin*, 4 S.C. 1, 3 (1872) (explaining that the statutory punishment for stealing a cow could no longer include the "corporal infliction" of public whipping because "whipping is abolished"); *State v. Nipper*, 81 S.E. 164, 165 (N.C. 1914) (describing common law punishments to include "corporal punishments . . . such as branding for manslaughter, cropping the ears for perjury, sitting in the stocks, and flogging"); 4 BLACKSTONE, at *158, *377 (giving examples of punishment "mixed with some degree of corporal pain" such as "whipping, . . . the pillory, the stocks, and the ducking-stool").

The death penalty—obviously—does not serve the purpose of *reforming* the offender. *Cf. State v. Allen*, 386 S.C. 93, 99, 687 S.E.2d 21, 24 (2009) (stating, "The justifications supporting imposition of the death penalty are retribution and deterrence," and saying nothing of reform or rehabilitation). Therefore, the "corporal . . . punishment" prohibited in article I, section 15 does not include the death penalty. *See State v. Lumbrick*, 4 N.C. 156, 157 (1814) (criticizing the drafters of a 1777 Act of the newly formed State of North Carolina and stating "the act was penned by a person totally ignorant of technical terms, for he thought capital punishment and corporal punishment were the same").

## ii

Turning to the prohibition on "cruel . . . punishment" in article I, section 15, we start by acknowledging the reality that there is simply no elegant way to kill a man. *See Glass v. Louisiana*, 471 U.S. 1080, 1093-94, 105 S. Ct. 2159, 2168, 85 L. Ed. 2d 514, 525 (1985) (Brennan, J., dissenting from the denial of certiorari) (stating "arguments about the 'humanity' and 'dignity' of *any* method of officially sponsored executions are a constitutional contradiction in terms").

South Carolina, however, has a long-established public policy of punishment that includes using the death penalty for the most heinous of crimes. Having maintained that policy for hundreds of years, we long-ago faced this reality—that carrying out the death penalty necessarily includes the act of killing the condemned man. That doing this necessitates some degree of physical pain and suffering on the part of the man is of no surprise, and the necessity of such physical pain and suffering does not render the death penalty unconstitutional. *See Bucklew v. Precythe*, 587 U.S. 119, 130-33, 139 S. Ct. 1112, 1123-24, 203 L. Ed. 2d 521, 532-34 (2019) (explaining that our history of carrying out the death penalty "tells us that the Eighth Amendment does not guarantee a prisoner a painless death"); *Glossip*, 576 U.S. at 869, 135 S. Ct. at 2733, 192 L. Ed. 2d at 769 ("And because some risk of pain is inherent in any

method of execution, we have held that the Constitution does not require the avoidance of all risk of pain."); *State of La. ex rel. Francis v. Resweber*, 329 U.S. 459, 464, 67 S. Ct. 374, 376, 91 L. Ed. 422, 426 (1947) ("The cruelty against which the Constitution protects a convicted man is . . . not the necessary suffering involved in any method employed to extinguish life humanely.").

This brings us to the meaning of "cruel" under article I, section 15. South Carolina first prohibited "cruel punishments" in our 1790 Constitution. S.C. CONST. of 1790, art. IX, § 4. That same year South Carolina ratified the United States Constitution and its prohibition against "cruel and unusual punishments" in the Eighth Amendment. Our conception of the term "cruel" for purposes of interpreting article I, section 15, therefore, derives from the same foundation used by the Supreme Court of the United States for purposes of analyzing the Eighth Amendment.

That foundation begins with *Kemmler* in 1890, in which the Supreme Court considered a claim by a condemned inmate—who soon became the first person ever executed by electrocution—that "he was sentenced to undergo a cruel and unusual punishment." 136 U.S. at 439, 10 S. Ct. at 931, 34 L. Ed. at 521. The Supreme Court quoted the Court of Appeals of New York's conclusion as to electrocution: "We have examined this testimony and can find but little in it to warrant the belief that this new mode of execution is cruel . . . ." 136 U.S. at 443, 10 S. Ct. at 932, 34 L. Ed. at 522 (quoting *People ex rel. Kemmler v. Durston*, 24 N.E. 6, 9 (N.Y. 1890)). The Supreme Court then found the Court of Appeals' conclusion was "plainly right" and affirmed. 136 U.S. at 447, 10 S. Ct. at 934, 34 L. Ed. at 524. Defining "cruel" in this context, the Supreme Court stated,

> Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life.

*Kemmler*, 136 U.S. at 447, 10 S. Ct. at 933, 34 L. Ed. at 524;[9] *see also Resweber*, 329 U.S. at 463, 67 S. Ct. at 376, 91 L. Ed. at 426 (discussing an alleged Eighth

---

[9] *Kemmler* has been widely criticized. *See, e.g., Baze v. Rees*, 553 U.S. 35, 116, 128 S. Ct. 1520, 1568, 170 L. Ed. 2d 420, 473 (2008) (Ginsburg, J., dissenting) (stating in reference to *Kemmler* and others, "Whatever little light our prior method-of-execution cases might shed is thus dimmed by the passage of time."); *Poyner v.*

Amendment violation and stating, "The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence"); *Bucklew*, 587 U.S. at 130, 139 S. Ct. at 1123, 203 L. Ed. 2d at 532 (quoting definitions of "cruel" as used in the Eighth Amendment: "Pleased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting" and "Disposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness" (cleaned up) (first quoting 1 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (London, W. Strahan 4th ed. 1773), then quoting 1 Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (N.Y., S. Converse 1828))).

In *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008)—building on the *Kemmler* foundation—a Supreme Court plurality stated, "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." 553 U.S. at 50, 128 S. Ct. at 1531,

---

*Murray*, 508 U.S. 931, 933, 113 S. Ct. 2397, 2399, 124 L. Ed. 2d 299, 300 (1993) (Souter, J., "respecting the denial of the petition for writ of certiorari") (stating in reference to *Kemmler*, "the holding of that case does not constitute a dispositive response to litigation of the issue in light of modern knowledge about the method of execution in question"); *Glass*, 471 U.S. at 1083, 105 S. Ct. at 2161, 85 L. Ed. 2d at 517 (Brennan, J., dissenting from the denial of certiorari) ("*Kemmler* clearly is antiquated authority."); 471 U.S. at 1094, 105 S. Ct. at 2169, 85 L. Ed. 2d at 525 (stating in reference to *Kemmler*, "courts cannot now avoid the Eighth Amendment's proscription of 'the unnecessary and wanton infliction of pain' in carrying out that penalty simply by relying on 19th-century precedents that appear to have rested on inaccurate factual assumptions and that no longer embody the meaning of the Amendment"); *State v. Mata*, 745 N.W.2d 229, 257 (Neb. 2008) (stating in reference to *Kemmler* and others, "The Supreme Court based its holdings on state courts' factual assumptions, which, in turn, relied on untested science from 1890"); *State v. Black*, 815 S.W.2d 166, 200 (Tenn. 1991) (Reid, C.J., concurring in part and dissenting in part) ("*Kemmler* was decided without any actual experience of electrocution as a means of execution.").

To be clear, we do not rely on *Kemmler* as precedent for the constitutionality of electrocution. We cite it primarily for its historical significance and we rely on it as a foundation for the meaning of "cruel."

170 L. Ed. 2d at 432-33 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S. Ct. 1970, 1983, 128 L. Ed. 2d 811, 831 (1994)).[10]  The *Baze* plurality noted the Supreme Court had previously "explained that to prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  553 U.S. at 50, 128 S. Ct. at 1531, 170 L. Ed. 2d at 432 (quoting *Farmer*, 511 U.S. at 828, 846 & n.9, 114 S. Ct. at 1974, 1983 & n.9, 128 L. Ed. 2d at 820, 831 & n.9).  In *Glossip*, a Supreme Court majority stated "prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'"  576 U.S. at 877, 135 S. Ct. at 2737, 192 L. Ed. 2d at 774 (quoting *Baze*, 553 U.S. at 50, 128 S. Ct. at 1531, 170 L. Ed. 2d at 432).  In *Bucklew*—still building on the *Kemmler* foundation—the Supreme Court summarized the historical meaning of "cruel" as those "forms of punishment that intensified the sentence of death with a . . . 'superadd[ition]' of 'terror, pain, or disgrace.'"  587 U.S. at 133, 139 S. Ct. at 1124, 203 L. Ed. 2d at 534 (quoting *Baze*, 553 U.S. at 48, 128 S. Ct. at 1530, 170 L. Ed. 2d at 431); *see also* 587 U.S. at 136-37, 139 S. Ct. at 1126-27, 203 L. Ed. 2d at 536 (stating "when it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence").

In their argument that electrocution is cruel, the inmates do not contend the definition of cruel has changed since *Kemmler*.  As counsel for the inmates stated at oral argument, "we are not saying the meaning of 'cruel' has changed; the [word] 'cruel' means the same now as it meant before."[11]  We agree, and hold the definition of the term "cruel" as used in article I, section 15 of the South Carolina Constitution—in the context of a method of carrying out the death penalty—is consistent with the principles set forth above from *Bucklew*, *Glossip*, *Baze*, *Resweber*, and *Kemmler*. An inmate challenging his impending method of execution as "cruel" under article I, section 15 must prove there is a substantial risk that the State's use of the method to execute him will inflict unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a death sentence.

---

[10] *Farmer* is not a method of execution case.  511 U.S. at 829, 114 S. Ct. at 1974-75, 128 L. Ed. 2d at 820.

[11] Counsel also stated "we are not saying the meaning of 'unusual' has changed."

Applying that definition to electrocution in South Carolina, we turn our attention back to 1971, when we adopted the current version of the South Carolina Constitution's prohibition on cruel punishment—article I, section 15. In 1971, as the State correctly points out, "everyone knew that electrocution was the State's only way of carrying out a death sentence." It is inconceivable, therefore, that the framers of article I, section 15 considered electrocution "cruel." However, relying on testimony presented at the circuit court trial and findings of fact the circuit court made based on that testimony, the inmates contend that what the medical and scientific communities now know about electrocution—that we did not know then— renders electrocution "cruel" under the original definition of that term. They argue,

> In . . . the 1970s, electrocution was still widely . . . understood to be a relatively painless method of execution . . . . When executions resumed in large numbers in the late 1980s, however, advances in science and medicine began to reveal the truth about the electric chair. Though the scientific and medical realities of death in the electric chair did not change from 1912 to [1995], our ability to understand those realities did.[12]

---

[12] The inmates also argue this Court should analyze article I, section 15 claims in light of "evolving standards of decency." We have used this phrase in the past in discussing Eighth Amendment claims, but we have not used it in the context of article I, section 15. *See, e.g.*, *Moore v. Stirling*, 436 S.C. 207, 219 n.2, 871 S.E.2d 423, 430 n.2 (2022) ("The Supreme Court has stated it applies 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual in violation of the Eighth Amendment." (quoting *Roper v. Simmons*, 543 U.S. 551, 561, 125 S. Ct. 1183, 1190, 161 L. Ed. 2d 1, 16 (2005))); *State v. Stanko*, 402 S.C. 252, 283, 741 S.E.2d 708, 724 (2013) ("The Eighth Amendment's prohibition against cruel and unusual punishment is viewed through the 'evolving standards of decency that mark the progress of a maturing society.'" (quoting *Roper*, 543 U.S. at 561, 125 S. Ct. at 1190, 161 L. Ed. 2d at 16)), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019). We disagree the concept of "evolving standards" should apply in a method of execution case under article I, section 15. Under this provision of our constitution, the "standard" is the definition of "cruel," which has not changed over time. The information and evidence to which we apply the standard does change, and such a change may render a different outcome of a constitutional analysis as the information used in that analysis "evolves."

Some of the inmates' testimony, however, and some of the circuit court's findings based on it, are absolutely irrelevant to any analysis of the constitutionality of execution by electrocution. For example, the inmates presented expert testimony "there is [not] any scientific proof that judicial electrocution is either instantaneous or painless." Based on that testimony, the circuit court found "there is no evidence to support the idea that electrocution produces an instantaneous or painless death."[13] As we already explained, whether a condemned inmate is expected to suffer a "painless death" is not the issue when considering the "cruel" prong of article I, section 15. *See Baze*, 553 U.S. at 50, 128 S. Ct. at 1531, 170 L. Ed. 2d at 432-33 (calling pain "an inescapable consequence of death"). The issue is whether the manner of bringing about death is cruel under the proper definition of that term.

There was also considerable testimony that does not relate directly to whether electrocution is cruel. One example of this arises in the inmates' discussion of "how, precisely, the electric chair causes death," which the inmates call "one of the main points in dispute" in the case. Addressing fibrillation of the heart—which causes the heart to stop pumping blood—the inmates presented the testimony of Dr. John P. Wikswo Jr. Dr. Wikswo testified that a heart in fibrillation no longer beats with a "beautiful rhythmic contraction from the bottom to the top," but instead has a current that "travels around the heart in a circle," causing it to "look[] like a small bag of earthworms just quivering." Dr. Wikswo and another expert presented by the inmates—Dr. Jonathan Arden—both testified electrical current stimulates the major muscles in the body and that causes them to "tetanize," which means to cramp or lock up. The inmates also presented evidence the human skull is significantly more

---

[13] We take particular issue with this finding because there is, in fact, evidence "to support the idea that electrocution produces an instantaneous or painless death." For example, Dr. Ronald Wright testified that with electrocution, "the entire body is depolarized" which essentially renders the sensory receptors in the brain ineffective so "that even though it might hurt, it doesn't hurt because there's no place to feel hurt . . . ." When Dr. Wright was asked how quickly an electric charge applied to the head "kills the brain," he responded "femtoseconds," which is a term that means one quadrillionth of a second. He continued, "When you have . . . electricity that's being supplied to the body . . . , it will depolarize [the brain] . . . at the speed of light." He was then asked, "So if I am understanding your testimony correctly, . . . the electricity . . . is going to depolarize the sensory -- the receptors in the brain quicker than the body can send pain signals to the brain, is that right?" Dr. Wright responded, "Yeah."

resistive to electrical current than the skin, the muscles, and the connective tissue around the head, meaning—the inmates contend—the electrical current "does not all enter the brain."

While this information may be indirectly relevant, it does not address the actual issue in the case—whether electrocution poses a substantial risk of unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a death sentence. The State's expert—Dr. Ronald Wright—testified that a person executed in the electric chair would feel no pain. He explained that when a person is electrocuted with very high voltage current, they are rendered instantaneously unconscious. *See supra* note 13. This is, of course, the original theory of the humanity of electrocution—that despite the damage it causes to the body, the condemned inmate feels no pain because the brain is immediately rendered insensate and the heart is almost immediately stopped. *See Kemmler*, 136 U.S. at 443-44, 10 S. Ct. at 932, 34 L. Ed. at 523 (reciting the original theory of electrocution as "the application of electricity to the vital parts of the human body . . . must result in instantaneous, and consequently in painless, death" (quoting *Durston*, 24 N.E. at 9)). The question of "how, precisely, the electric chair causes death" might be—as the inmates contend—"one of the main points of dispute," but the answer to the question is unimportant to our article I, section 15 analysis unless the inmates have connected the point to Dr. Wright's—and the State's—contention that electrocution causes the brain to quickly become insensate and the heart to almost immediately stop. Until the inmates make that connection, and through it meet their burden of proving electrocution causes unnecessary and excessive pain, the information recited above is interesting from an academic standpoint, but not helpful to our inquiry.

The question that is critical to our inquiry into whether electrocution is "cruel" under article I, section 15 is the extent to which the inmates have proven that electrocution poses a substantial risk of unnecessary and excessive pain. On this critical question, the inmates presented testimony that was inconclusive. The testimony was offered primarily as a response to the State's position—articulated by Dr. Wright—that electrocution causes instantaneous loss of all brain function, including the capability of sensing pain. Dr. Wikswo did not expressly disagree on this point, but testified he simply does not know. In fact, when asked if he knew how long it takes for the brain to become insensate during electrocution, he stated, "I don't believe that anyone today knows how long [is the] period of time" before an inmate becomes insensate. He also stated, "So what happens is that the initial shock may be -- may or may not be rendering the brain insensate . . . ," and, "That current, depending on how it's flowing, will render some of the brain nonfunctional."

Also on this critical question, Dr. Arden explained there are three ways electrocution can cause death, either individually or in combination. He testified: (1) "electric current can . . . interfere with the functioning of the brain," (2) "electrical current can stop the heart," and (3) "the passage of electric current through the body and parts of the body can also generate substantial degrees of heat, amounts of heat, and so there can be thermal damage to the body." As to whether the person dies by the first effect, which Dr. Wright described as the person is rendered instantaneously unconscious— like Dr. Wikswo—Dr. Arden testified he does not know. He stated, "I don't think there's any way to predict does the current immediately render you unconscious or not." He then testified, "Well, again . . . , we don't really know how this affects people and whether it does -- could render them unconscious or insensate rapidly or immediately or not."

If a person dies by the second effect—because the heart fibrillates—Dr. Arden testified, the person would remain alive and conscious for approximately fifteen seconds after fibrillation, during which time "the person . . . would have normal consciousness and -- and sensation. So if the current is still being applied, then that person would feel the pain and the -- the pretty horrific sensation of having electric current going through his body." As to how long it would take for the heart to stop pumping blood because of fibrillation, Dr. Arden testified there is not "any way to determine whether a judicial electrocution is going to instantaneously cause that complete stoppage of the heart," but it "has the potential to do that." If the person dies by the third effect—thermal damage—he testified, the pain would be even worse. He explained, "Basically, I'm sorry to have to say this so plainly, but you get the effects on parts of the body, including internal organs, that's the equivalent of cooking."

On this critical question, therefore, the State presented Dr. Wright's testimony that an inmate will be unable to feel pain because the electrocution immediately "kills the brain." Drs. Wikswo and Arden both testified essentially that they do not know whether Dr. Wright is correct, nor if he is incorrect, how long it takes before the brain becomes insensate to pain. Dr. Wright also testified that electrocution causes the heart to fibrillate almost immediately. Dr. Arden testified that if the inmate dies by this second effect—the heart is stopped—he will remain conscious and feel pain for approximately fifteen seconds. Therefore, the only way—even under the inmates' theory of this case—an inmate could possibly feel unconstitutionally cruel pain during an electrocution is if the State and Dr. Wright are squarely wrong as to whether the brain will immediately become insensate and the heart will almost immediately stop. On both points, the inmates' experts' testimony—viewed even in the light most favorable to the inmates—is that they do not know. In fact, Dr. Arden

testified, "I do not believe there's any reliable method to determine which of these mechanisms is most likely or which one would occur first or if they would occur simultaneously." Viewing all the evidence in the light most favorable to the inmates,[14] the only finding supported by the evidence is that there is unresolved disagreement as to whether the initial electric shock renders the inmate insensate, and thus whether the inmate will suffer any pain.

This takes us back to presumed legislative findings. *See Richards*, 227 S.C. at 561, 88 S.E.2d at 694 (stating "it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment"). South Carolina initially adopted electrocution in 1912. In 1995, our General Assembly kept electrocution as an available method of execution, even though the inmate could elect lethal injection. In 1912 and in 1995—as we stated in *Richards*—the General Assembly "is presumed" from its actions to have found "such facts as were necessary to authorize the enactment." *Richards*, 227 S.C. at 561, 88 S.E.2d at 694. But the legislative event we must focus on in this case for the purpose of presumed findings occurred in 2021, when for the third time our General Assembly chose electrocution as a possible method for carrying out the death penalty. Decades before then—by the late 1970s according to the Supreme Court plurality in *Baze*—"state legislatures began responding to public calls to reexamine electrocution as a means of ensuring a humane death." 553 U.S. at 42, 128 S. Ct. at 1526, 170 L. Ed. 2d at 428 (citing Stuart Banner, THE DEATH PENALTY: AN AMERICAN HISTORY 192-93, 296-97 (2002)). In 1985, a Justice of the Supreme Court of the United States wrote, "Throughout the 20th century a number of distinguished electrical scientists and medical doctors have argued that the available evidence strongly suggests that electrocution causes unspeakable pain and suffering." *Glass*, 471 U.S. at 1088, 105 S. Ct. at 2165, 85 L. Ed. 2d at 521 (Brennan, J., dissenting from the denial of certiorari). The Justice also stated, citing authorities from as early as 1950, "the assumption that death in these circumstances is instantaneous and painless" is "'open to serious question' and is 'a matter of sharp conflict of expert opinion.'" *Id.* By 2008, two state supreme courts had declared electrocution to be cruel punishment and therefore unconstitutional. *State v. Mata*, 745 N.W.2d 229, 279 (Neb. 2008); *Dawson v. State*, 554 S.E.2d 137, 139 (Ga. 2001). By 2021, the "sharp conflict of expert opinion" over whether "electrocution causes unspeakable pain and suffering" that Justice Brennan discussed in *Glass* had been debated nationally for decades.

---

[14] We do this here only for the purpose of illustrating our point that the inmates' testimony is inconclusive. We set forth our actual standard for decision in section III.

In light of this decades-long debate, it is inconceivable that our General Assembly did not consider in 2021 whether electrocution causes the brain to quickly become insensate or the heart to stop. *Richards* requires us to presume that when our General Assembly enacted the current version of section 24-3-530 in 2021, it was aware of this debate, considered the question, and again made findings regarding the degree to which electrocution would cause unnecessary and excessive pain "as were necessary to authorize the enactment." In the face of this decades-long dispute over electrocution, considering the enactment only three years ago of the current version of section 24-3-530, and in light of the inconclusive evidence presented by the inmates, this Court finds the inmates have not met their burden of proving electrocution as a method of carrying out our death penalty will inflict unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a death sentence. We hold, therefore, the section 24-3-530 provision that electrocution is the default method of execution in South Carolina is not unconstitutionally cruel under article I, section 15 of the South Carolina Constitution.

As a final matter regarding whether electrocution is cruel, we turn to the inmates' argument that the State might "botch" the execution. The circuit court emphasized the potential for electrocutions to "not go according to plan" because of the "inherently unpredictable nature of electrocution and the occurrence of human error." The circuit court found, "The human body is largely unpredictable and it is not possible to know with certainty, in advance, how any given person will respond to an electrocution in the electric chair on any given day." We see no constitutional significance in these findings. Any human endeavor carries with it the risk that it will not go as planned. Certainly, the history of capital punishment is replete with incidents of failed executions. In the case of Kemmler himself, on remand from the Supreme Court's 1890 decision finding electrocution constitutional, the State of New York "botched" the execution. *See Far Worse than Hanging: Kemmler's Death Proves an Awful Spectacle*, N.Y. TIMES, Aug. 7, 1890 (stating, "Probably no convicted murderer of modern times has been made to suffer as Kemmler suffered. Unfortunate enough to be the first man convicted after the passage of the new execution law . . . ," and calling it "an execution that was a disgrace to civilization"). The inmates cite other such incidents in their brief, and early this year the State of Idaho failed to carry out an execution by lethal injection. *See* Mike Baker, *A Botched Execution in Idaho Renews Scrutiny of Lethal Injection*, N.Y. TIMES (Feb. 28, 2024), https://www.nytimes.com/2024/02/28/us/idaho-death-penalty-thomas-creech.html (last visited July 24, 2024) ("The failure was the latest in a series of botched executions around the country, often stemming from executioners having trouble finding veins. Amid legal pressures, some states have

been exploring alternatives, including nitrogen gas, and Idaho is among states that recently approved the use of firing squads to carry out capital punishments."). The inescapable reality that an execution by any method may not go as planned—that it will be "botched"—does not render the method "cruel" under the constitution. *See Resweber*, 329 U.S. at 462, 463, 67 S. Ct. at 375, 376, 91 L. Ed. at 425, 426 (stating, "Accidents happen for which no man is to blame," permitting Louisiana to proceed with an electrocution even after an earlier failed attempt, and holding, "We find nothing in what took place here which amounts to cruel and unusual punishment in the constitutional sense").

### iii

Finally as to electrocution, we turn to the article I, section 15 prohibition of "unusual punishment." Since the advent of death by lethal injection in 1995, very few inmates have been executed in the electric chair in South Carolina. The inmates who brought this case represent to us that only seven men have been electrocuted in South Carolina since 1976. Many states have altogether abandoned the electric chair as a means of carrying out the death penalty, and today only nine states—including South Carolina—include electrocution as even a possible means of execution.[15] Electrocution—in South Carolina and across the country—has clearly become uncommon.

Nevertheless, we hold electrocution is not "unusual" under article I, section 15. Determining whether a punishment—or in this case a method of carrying out punishment—is unusual in the constitutional sense requires more than a statistical analysis of how commonly the method is used. This point is clearly illustrated by considering two scenarios—one actual, one hypothetical—both involving lethal injection. In 1995 in South Carolina, lethal injection had never been used. Its statistical percentage of use was precisely zero. It was, therefore, uncommon, or—at least in the non-constitutional sense of the word—"unusual." Yet, no one would

---

[15] The Death Penalty Information Center reports that seven of those states employ electrocution, but that they "have lethal injection as primary method" of execution. *Methods of Execution*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/methods-of-execution (last visited July 24, 2024). In March of this year, Louisiana reintroduced electrocution as an authorized method of execution in legislation that became effective July 1, 2024. Act No. 5, 2024 La. Acts ___ (2nd Extraordinary Sess.) (to be codified at La. Stat. Ann. § 15:569).

have contended in 1995 that lethal injection was barred by article I, section 15. In part, that is because the article I, section 15 prohibition on "unusual punishment" was not intended to inhibit innovative efforts to make execution less inhumane. Innovative methods of carrying out the death penalty—designed to reduce the pain necessarily involved in killing a man—cannot be unconstitutional simply because they have never been tried before.

On the other hand, hypothetically, if the difficulties states faced in obtaining drugs to carry out lethal injection lasted for decades—fifty years perhaps—no one would contend upon the renewed availability of the drugs that article I, section 15 prohibits lethal injection. The simple statistical fact a method of execution has never been used, or has not been commonly used in recent years, cannot render the method "unusual" in its constitutional sense.

Therefore, if a method of punishment—or a method of carrying out a form of punishment—has never been used, or has become statistically uncommon, an article I, section 15 analysis requires consideration of the reasons for the statistical lack of use. To demonstrate that a form of punishment or a method of execution constitutes "unusual punishment"—as that term is used in article I, section 15—an inmate bringing a constitutional challenge must show that it is out of use *because* it has been rejected by the citizenry. It is not enough to show that—as a mere happenstance—it has become statistically uncommon. In South Carolina, the reason electrocution became uncommon was that most inmates who had the choice between electrocution or lethal injection chose the latter. Electrocution was not rejected by the people of South Carolina as a matter of policy, it simply was not used. This is a different situation from hanging—once the predominant method of execution—when hanging was replaced by electrocution in 1912. At that time, the people of South Carolina actually rejected hanging as a policy determination—acting through their elected representatives—for its barbaric qualities. The same occurred in the majority of American states.[16] Electrocution, on the other hand, was retained by the people in 1995—through their elected representatives—and became uncommon only because condemned inmates hardly ever chose it as their means of execution. Thus, while

---

[16] *See, e.g.*, *Kemmler*, 136 U.S. at 444, 10 S. Ct. at 932-33, 34 L. Ed. at 523 (explaining that the Governor of New York "transmitted" a message to their legislature on "January 6, 1885, as follows: 'The present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner.'").

electrocution has become uncommon, it is not an "unusual punishment" under article I, section 15.

<h1 style="text-align:center">C</h1>

The next method we address is lethal injection. On this point, the inmates make a limited concession: "Respondents have conceded, and they continue to concede, that execution by lethal injection using a single dose of pentobarbital is constitutional if properly administered using reliable and effective drugs." The inmates do not concede, however, that section 24-3-530 is constitutional simply because this particular protocol for lethal injection is constitutional. Rather, the inmates argue the choice the section gives to each inmate as to which method to elect must be a meaningful choice, and to meet that requirement, the section must provide at least two constitutional choices. We will address below the role of choice in the constitutionality of section 24-3-580, but for purposes of analyzing the constitutionality of lethal injection as a method of carrying out the death penalty, the inmates' limited concession renders any further analysis unnecessary.

<h1 style="text-align:center">D</h1>

We turn now to the firing squad. To begin our discussion of this method of execution, we emphasize that section 24-3-530 will never require an inmate's execution be carried out by the firing squad. Rather, a condemned inmate in South Carolina will be subjected to the firing squad only if he chooses it in a formal "election" as set forth in the statute. *See* § 24-3-530(A) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the convicted person, by firing squad or lethal injection . . . ."). The constitutional question before us, therefore, is not whether some other state that requires inmates to be executed by firing squad thereby subjects those inmates to unconstitutional punishment. Rather, the question is whether section 24-3-530 is unconstitutional because it gives condemned inmates in South Carolina a choice as to how their execution will be carried out, a choice that includes the firing squad.

<h1 style="text-align:center">i</h1>

As we explained in section IV.B.i, the "corporal . . . punishment" prohibited in article I, section 15 does not include the death penalty. Therefore, the State's use of the firing squad to carry out the death penalty does not violate the article I, section 15 prohibition on "corporal . . . punishment."

Turning to the prohibition on "cruel . . . punishment" in article I, section 15, our definition of the term requires the inmates to prove that the method of execution at issue—here the firing squad[17]—poses a substantial risk of unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a death sentence. Our definition of cruel does not call upon us to analyze what the death chamber looks like after the execution has been carried out. There is no consideration in our analysis of whether a method of execution is "cruel" of the dramatic imagery set forth in the Chief Justice's dissent, the circuit court's order, or the inmates' brief, such as blood soaked in the inmate's clothing, spattered on the walls, and pooling on the floor, or other physical violence to the body that occurs simultaneous with or subsequent to the cessation of pain. While each of these might have been political concerns addressed by our General Assembly, they are not constitutional concerns. Our definition of cruel defines the critical question, and requires us to focus us on the risk of unnecessary and excessive conscious pain.

As to that critical question, the evidence before us convinces us—though an inmate executed via the firing squad is likely to feel pain, perhaps excruciating pain—that the pain will last only ten to fifteen seconds. One of the State's expert witnesses—Dr. D'Michelle DuPre—testified the heart of a person shot by the firing squad would "immediately stop . . . beating" and the person would lose consciousness "so quick that they would not experience pain at all." Another State's expert—Dr. Jorge Alvarez—testified a person shot in the heart would be unconscious "in less than ten seconds." The circuit court found "the inmate is likely to be conscious for a minimum of ten seconds after impact." Other evidence indicates that unless the shots each miss their mark, the inmate will be unconscious—and therefore insensate to pain—very soon after ten seconds have elapsed. The inmates' expert Dr. Arden testified "you're talking about approximately fifteen seconds from the time of the gunshots to the time of unconsciousness." Dr. Arden's testimony establishes that the outer limit of the period of time in which an inmate will suffer pain—unless there is a massive botch of the execution in which each member of the firing squad simply misses the inmate's heart—is hardly more than fifteen seconds.

---

[17] The current protocol for this method of execution calls for the inmate to be shot in the heart by multiple members of the firing squad using ammunition calculated to do maximum damage to—and thereby immediately stop—the heart.

This evidence is consistent with what is becoming a national consensus. In her opinion dissenting from the Supreme Court's denial of certiorari in a recent case, Justice Sotomayor wrote,[18]

> Some might find [the firing squad] regressive, but the available evidence suggests "that a competently performed shooting may cause nearly instant death." In addition to being near instant, death by shooting may also be comparatively painless. And historically, the firing squad has yielded significantly fewer botched executions.

*Arthur v. Dunn*, 580 U.S. 1141, ____, 137 S. Ct. 725, 733-34, 197 L. Ed. 2d 225, 234 (2017) (Sotomayor, J., dissenting from the denial of certiorari) (citations omitted) (quoting Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551, 688 (1994)); *see also Glossip*, 576 U.S. at 880, 135 S. Ct. at 2739, 192 L. Ed. 2d at 776 ("[T]here is some reason to think [the firing squad] is relatively quick and painless." (quoting 576 U.S. at 977, 135 S. Ct. at 2796, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting)); *Glossip*, 576 U.S. at 976, 135 S. Ct. at 2796, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting) (stating "there is evidence to suggest that the firing squad is significantly more reliable than other methods, including lethal injection"); 576 U.S. at 977, 135 S. Ct. at 2797, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting) (discussing the firing squad and stating, "from a condemned inmate's perspective, . . . such visible yet relatively painless violence may be vastly preferable to an excruciatingly painful death hidden behind a veneer of medication"); *Arthur*, 580 U.S. at ____, 137 S. Ct. at 725, 733-34, 197 L. Ed. 2d at 225, 233-34 (Sotomayor, J., dissenting from the denial of certiorari) (arguing that condemned inmate Thomas Arthur of Alabama satisfied the *Glossip* requirement that he "propose a 'known and available' alternative method for his own execution" by proposing the firing squad, and stating lethal injection "may turn out to be our most

---

[18] In this section discussing the firing squad and in section VI, we include several statements from dissenting opinions written by Justice Sotomayor. While we find these statements useful in analyzing the issues before us, we do not read her opinions to advocate for the use of the firing squad to carry out an execution. *See Glossip*, 576 U.S. at 977, 135 S. Ct. at 2797, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting) (discussing the "visible brutality" of death by firing squad and stating, "A return to the firing squad—and the blood and physical violence that comes with it—is a step in the opposite direction" from "the States' centuries-long search for 'neat and non-disfiguring homicidal methods.'").

cruel experiment yet"); *Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir. 2014) (Kozinski, C.J., dissenting from denial of rehearing en banc) ("The firing squad strikes me as the most promising [method of execution] . . . , causing instant death every time.").

The ten- to fifteen-second period in which the firing squad might cause an inmate pain comes as close to a "painless death"—not guaranteed by the constitution—as any method of execution is likely to come. We hold, therefore, the firing squad is not "cruel . . . punishment" under article I, section 15. *See Bucklew*, 587 U.S. at 132, 139 S. Ct. at 1124, 203 L. Ed. 2d at 534 (explaining the constitution "does not guarantee a prisoner a painless death").

### iii

We turn now to the question whether permitting an inmate to choose the firing squad as his method of execution is "unusual punishment" under article I, section 15. Five years ago in *Bucklew,* the Supreme Court of the United States listed the firing squad as one of the "traditionally accepted methods of execution." 587 U.S. at 134, 139 S. Ct. at 1125, 203 L. Ed. 2d at 535. Three years ago in *Johnson v. Precythe*, ___ U.S. ___, 141 S. Ct. 1622, 210 L. Ed. 2d 849 (2021), Justice Sotomayor, dissenting from the denial of certiorari, stated "the firing squad has a long history of successful use." ___ U.S. at ___, 141 S. Ct. at 1623, 210 L. Ed. 2d at 850. The *Bucklew* Court made its comment as part of an analysis of the progression from one method of execution to another "as soon as an arguably more humane method like lethal injection becomes available." 587 U.S. at 134, 139 S. Ct. at 1125, 203 L. Ed. 2d at 535; *see also Glossip*, 576 U.S. at 977, 135 S. Ct. at 2797, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting) (remarking "lethal injection represents just the latest iteration of the States' centuries-long search for 'neat and non-disfiguring homicidal methods'" (quoting Craig Brandon, THE ELECTRIC CHAIR: AN UNNATURAL AMERICAN HISTORY 39 (1999))). As some of the discussion above indicates, that progression may be moving away from lethal injection and toward the firing squad. In fact, within the last year Idaho became the fifth American state to permit executions by firing squad. *See* 2023 Idaho Sess. Laws 390 (adding subsection (1)(b) to Idaho Code section 19-2716 to permit execution by "firing squad").[19]

---

[19] *See* Death Penalty Information Center, *supra* note 15 (listing the four other states as Mississippi, Oklahoma, Utah, and South Carolina).

The progression toward the firing squad is now getting traction in the federal courts. In a recent case from Alabama, condemned inmate Anthony Boyd brought a federal lawsuit in which he argued he should be executed by firing squad. *Boyd v. Warden, Holman Corr. Facility*, 856 F.3d 853, 859 (11th Cir. 2017). The district court summarily dismissed the claim, stating the "allegations that execution by firing squad . . . entail a lesser risk of pain than Alabama's current lethal injection protocol 'are nothing more than bare-bone legal conclusions unsupported by facts.'" 856 F.3d at 863. The Eleventh Circuit was not so dismissive, and engaged in a lengthy analysis of whether the inmate's firing squad proposal met the federal procedural requirement of proving an alternative method of execution that substantially reduces the risk of severe pain. *See* 856 F.3d at 858 ("It is by now clear in capital cases that a plaintiff seeking to challenge a state's method of execution under the Eighth Amendment of the United States Constitution must plausibly plead, and ultimately prove, that there is an alternative method of execution that is feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution."); *see also infra* section VI (discussing the *Baze-Glossip* test). Ultimately, in a divided opinion, the Eleventh Circuit affirmed the district court's dismissal. 856 F.3d at 868.

In a subsequent case, however, the Eleventh Circuit reversed a district court's dismissal of the same claim. In that case, condemned inmate Michael Wade Nance "proposed death by firing squad" as "an alternative method of execution that would reduce his risk of severe pain." *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1152 (11th Cir. 2023). The Eleventh Circuit ruled, "Nance has plausibly alleged that execution by firing squad would be a viable and less painful alternative method of execution" to lethal injection "as applied to him," and remanded his case to the district court for further proceedings. 59 F.4th at 1155-57.[20]

But the point of our discussion of *Boyd* and *Nance* has little to do with the outcome of those cases. The point, rather—also illustrated by many of the quotations recited above—is that despite the fact no executions have ever been carried out by firing

---

[20] Between the district court's initial dismissal in *Nance* and the Eleventh Circuit's decision just discussed, the case went to the Supreme Court of the United States on an unrelated procedural issue. *See Nance v. Ward*, 597 U.S. 159, 142 S. Ct. 2214, 213 L. Ed. 2d 499 (2022) (holding an inmate pursuing a method of execution claim in federal court may present that claim under 42 U.S.C. § 1983 even when his proposed alternative method is not currently authorized under the law of his state).

squad in South Carolina, and even nationally they are extremely rare, there is a serious discussion developing in this country as to whether the firing squad is a less inhumane method of execution than even lethal injection. In fact, concurring in the judgment in *Boyd*, a judge of the Eleventh Circuit wrote,

> Boyd . . . alleges that Alabama's current execution method—lethal injection using midazolam—poses a substantial risk of severe pain, and Alabama does not dispute the sufficiency of those allegations. Accordingly, if Boyd has sufficiently alleged that death by firing squad does not involve such a risk, his allegations support a finding that the firing squad significantly reduces a substantial risk of severe pain. He has done exactly that.

856 F.3d at 882 (Wilson, J., concurring) (footnote omitted).

We remarked earlier that we will not read article I, section 15 to inhibit the State's efforts to make execution less inhumane. Article I, section 15 of our constitution must be read to permit innovation as to methods of execution, such as occurred in 1912 with electrocution and in 1995 with lethal injection. While "the firing squad could be seen as a devolution to a more primitive era," as Justice Sotomayor wrote in her dissent in *Glossip*, 576 U.S. at 977, 135 S. Ct. at 2796, 192 L. Ed. 2d at 840, not everyone sees it that way. These four inmates concede that lethal injection by a single dose of pentobarbital is constitutional. The next inmate, however, might not agree. *See Glossip*, 576 U.S. at 976, 135 S. Ct. at 2796, 192 L. Ed. 2d at 840 (Sotomayor, J., dissenting) ("In the future, . . . some inmates may suggest the firing squad as an alternative" to lethal injection.). In fact, acting pursuant to the choice given him under section 24-3-530 and responding to the Notice of Execution of April 7, 2022, Respondent-Appellant Moore elected on April 15, 2022 to be executed by the firing squad.

As we discussed regarding electrocution, the simple statistical fact a method of execution has not been commonly used will not render the method "unusual." *See Glossip*, 576 U.S. at 895, 135 S. Ct. at 2747, 192 L. Ed. 2d at 785 (Scalia, J., concurring) (stating with his usual flair that "unusual" does not mean simply a "decline in use"). Rather, an inmate bringing a constitutional challenge must show that the method is not used because it has been rejected by the citizenry. There is absolutely no evidence the citizens of South Carolina in any way ever rejected the firing squad. In fact, the firing squad has never been used in South Carolina for a valid and easily-understood reason that is simply an historical "happenstance"—not

a rejection: until the drugs necessary for lethal injection became unavailable in the years preceding the 2021 amendments to section 24-3-530, South Carolina policymakers—the General Assembly—had no occasion to consider alternative methods to electrocution and lethal injection. That occasion arose as capital punishment came to a halt in South Carolina beginning in the late 2000s. By adding the firing squad as a choice to two other methods of execution that are constitutional under article I, section 15, the State did not "inflict" an "unusual punishment" as the section prohibits. Rather, the State gave inmates a choice, and "choice" is not "unusual" under our constitution.

## V. Other Claims

The inmates make three other claims regarding section 24-3-530. Two are constitutional claims we address in section V.A and one is a statutory interpretation claim we address in section V.B.

## A

The inmates argue the use of the word "available" in section 24-3-530 renders the section unconstitutional. They make two specific points. First, they argue the term "available" is unconstitutionally vague. Specifically, they argue that "because the law does not define the word 'available' or provide any standards for determining what the word means in context, it fails to give 'fair notice to those persons to whom the law applies' and is therefore impermissibly vague." *See S.C. Hum. Affs. Comm'n v. Zeyi Chen*, 430 S.C. 509, 529, 846 S.E.2d 861, 871 (2020) (explaining "the void-for-vagueness doctrine" provides a statute may not set forth a "rule or standard . . . so vague and indefinite as to really be no rule or standard at all" (citing *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118, 123, 87 S. Ct. 1563, 1566, 18 L. Ed. 2d 661, 665-66 (1967))); *In re Amir X.S.*, 371 S.C. 380, 391, 639 S.E.2d 144, 150 (2006) ("The constitutional standard for vagueness is whether the law gives fair notice to those persons to whom the law applies."). Second, they argue that by delegating to the Director of the Department of Corrections the task of determining which particular drug protocol to use for carrying out an execution by lethal injection, and then not defining the extent of the Director's duty to seek and find those drugs, section 24-3-530 "impermissibly gives the Director unfettered discretion to determine what the law is in violation of the non-delegation principle."[21] *See Hampton v. Haley*, 403 S.C. 395, 407, 743 S.E.2d 258, 264 (2013)

---

[21] Initially, the inmates argued that what they call the Director's "unfettered discretion" permitted the Director to choose to not make the firing squad available

(explaining the non-delegation "doctrine is a component of the separation of powers doctrine and prohibits the delegation of one branch's authority to another branch" (citing *Bauer*, 271 S.C. at 232, 246 S.E.2d at 876)); S.C. CONST., art. I, § 8 (providing "the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other").

We disagree on both points. We hold the term "available" as it is used in section 24-3-530 is not unconstitutionally vague. In fact, the Supreme Court itself has used the term to define a state's obligations to avoid cruel punishment under the Eighth Amendment. *See Bucklew*, 587 U.S. at 134, 139 S. Ct. at 1125, 203 L. Ed. 2d at 535 ("The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is 'substantial when compared to a known and *available* alternative.'" (emphasis added) (quoting *Glossip*, 576 U.S. at 878, 135 S. Ct. at 2738, 192 L. Ed. 2d at 775)); *see also Baze*, 553 U.S. at 61, 128 S. Ct. at 1537, 170 L. Ed. 2d at 439 (same).

The term "available" appears in subsections (A), (B), (C), and (E) of section 24-3-530, and "unavailable" appears in subsection (D). We focus, however, on subsection (B), which provides, "Upon receipt of the notice of execution, the Director of the Department of Corrections shall determine and certify by affidavit under penalty of perjury to the Supreme Court whether the methods provided in subsection (A) are available." § 24-3-530(B). From this text, the Director should have no difficulty understanding his responsibilities. First, he must use reasonably diligent and thorough efforts to obtain the drugs necessary to carry out an execution. Second, he must explain to the condemned inmate and other parties legally entitled to the explanation the results of his efforts. In making this explanation—no matter the result of his efforts—he must comply with the confidentiality requirements of the shield statute as set forth in section 24-3-580. If the Director does not succeed in obtaining the drugs, he must provide sufficient detail regarding his efforts to permit those legally entitled to the explanation to evaluate whether the efforts were, in fact, reasonably diligent and thorough. Using Stirling's June 8, 2021 letter to illustrate our point, the conclusory statement that he "has been unable, despite numerous and diligent attempts, to acquire the drugs necessary, in usable form, to perform a lethal

at all. We resolved that issue when—in our June 16, 2021 order quoted above—we required the Director to "develop[] and implement[] appropriate protocols and policies to carry out executions by firing squad."

injection" is not sufficient. If the Director does obtain the drugs, which we will address in more detail in the next subsection of the opinion, the Director must explain to those legally entitled to the explanation the basis of his determination that the drugs are of sufficient "potency, purity, and stability" to carry out their intended purpose.

Thus, neither subsection 24-3-530(B) nor any other subsection using the words "available" or "unavailable" is unconstitutionally vague because, from the language of the subsection, the Director may readily understand his obligations. *See Zeyi Chen*, 430 S.C. at 529, 846 S.E.2d at 871 ("A law is unconstitutionally vague if it . . . requires the doing of an act in terms so vague that a person of common intelligence must necessarily guess as to its meaning and differ as to its application." (quoting *S.C. Dep't of Soc. Servs. v. Michelle G.*, 407 S.C. 499, 506, 757 S.E.2d 388, 392 (2014))).

In their unlawful delegation argument, the inmates contend section 24-3-530 permits the Director to essentially override legislative policy because the section does not "place[] at least some duty on the Director to make a bona fide effort to give each inmate who is scheduled to die a choice between all three methods, including lethal injection." As our discussion of whether the term "available" is unconstitutionally vague demonstrates, the section does place such a duty on the Director. Therefore, section 24-3-530 is not an unlawful delegation of authority.

**B**

The inmates' statutory interpretation claim is that the terms of section 24-3-530 require the Director to "disclos[e] some basic facts about the drug's creation, quality, and reliability," or—as counsel stated at oral argument—the drugs' "potency, purity, and stability." As we already explained, we agree with this argument. There is a Due Process Clause component to our analysis of this claim,[22] but the point of law on which we primarily rely is the text of subsection 24-3-530(B) itself. That text requires "the Director . . . shall determine and certify by affidavit . . . whether the

---

[22] *See Baze*, 553 U.S. at 50, 128 S. Ct. at 1531, 170 L. Ed. 2d at 433 (referencing Justice Frankfurter's concurring opinion in *Resweber* in which he "noted . . . based on the Due Process Clause . . . 'a hypothetical situation' involving 'a series of abortive attempts at electrocution'" (quoting *Resweber*, 329 U.S. at 471, 67 S. Ct. at 380, 91 L. Ed. at 430 (Frankfurter, J., concurring))).

methods . . . are available." To fulfill this requirement, the Director must explain in the affidavit the basis for his determination.[23]

To make the determination, the Director necessarily goes through a process that he decides is appropriate for satisfying himself that the drugs are capable of carrying out the death sentence according to law. The text of section 24-3-530 requires nothing more than that the Director set forth that process in sufficient detail that a condemned inmate and his attorneys may understand whether there is a basis for challenging the constitutionality of the impending execution. We illustrate the scope of this requirement with two extreme examples. First, if the Director certified in the affidavit he made the determination the drugs were sufficient by accepting the word of an unnamed person with unknown qualifications—which we are sure Stirling

---

[23] Section 24-3-530 creates a potential timing problem for the filing of the Director's affidavit and the inmate's election of a method of execution. Under section 17-25-370, the execution must take place "on the fourth Friday after the" Director's "receipt" of the Notice of Execution, which leaves no more than twenty-eight days and possibly as few as twenty-two days for everything to take place. Under subsections 24-3-530(A) and (C), the condemned inmate must make his election fourteen days before the execution date. It was the obvious intent of the legislature that the Director provide the affidavit before the inmate is required to elect his method of execution. For this to happen, the combined timing requirements of the two statutes leave only a maximum of fourteen days and a minimum of eight days between the two events. We encourage our General Assembly to address this potential problem. In the meantime, however, to avoid any confusion that may arise from the inmate not knowing which methods of execution are available at the time he is required to elect, we will (1) issue notices of execution only on Fridays, and (2) require the Director to file the subsection 24-3-530(B) affidavit within five days of the Notice of Execution. This procedure should allow the Director plenty of time as he will be able to anticipate when the Notice will be issued. If for some reason the Director requires additional time, the State may seek a stay of execution. If the inmate claims the information in the affidavit does not comply with the requirements of section 24-3-530, he must file a motion for a stay of execution "no later than fifteen . . . days prior to the date of the scheduled execution." *In re Stays of Execution in Cap. Cases*, 321 S.C. 544, 548, 471 S.E.2d 140, 142 (1996). This procedure gives the inmate at least eight days in which to evaluate the affidavit and file any motion. As the *In re Stays* order also requires, "The motion must demonstrate that there are exceptional circumstances warranting the issuance of the stay." *Id.*

would not do—the determination would clearly be insufficient. On the other hand, if the Director certified in the affidavit that scientists at the Forensic Services Lab of the South Carolina Law Enforcement Division (SLED), whose experience and qualifications were verified by the Director and the Chief of SLED, recently performed testing according to widely accepted testing protocols and found the drugs were not only stable, but of a clearly acceptable degree of purity, then we doubt there could be any legitimate legal basis on which to mount a challenge. We decline to offer further particulars on where between these extremes the Director's explanation must fall; that is initially for the Director to decide. We reiterate that the Director must comply with the shield statute. However, he must explain in the affidavit how he determined the drugs were of sufficient "potency, purity, and stability" to carry out their intended purpose. If a challenge is made, this Court will promptly decide if the challenge warrants relief.

## VI. Constitutionality of Section 24-3-530—Choice

In the prior sections of this opinion, we addressed the constitutionality of individual elements of section 24-3-530, such as electrocution, lethal injection, and the firing squad. In this section we address the statute as a whole, and particularly the element of choice. As far as we are aware, South Carolina and Alabama are the only two American states that allow the condemned inmate to choose between three alternative methods of execution.[24] This element of choice in our statutory scheme for carrying out the death penalty significantly changes the constitutional analysis from the analysis of a statutory scheme in which the State makes the choice.

To illustrate this point, we turn back to *Baze*, *Glossip*, and *Bucklew*. In those three decisions, the Supreme Court emphasized the definition of "cruel" under the Eighth Amendment includes a relative component that requires an inmate challenging in federal court the method of his impending execution as cruel "must show that the risk [of severe pain] is substantial when compared to the known and available alternatives." *Baze*, 553 U.S. at 61, 128 S. Ct. at 1537, 170 L. Ed. 2d at 439; *see also Glossip*, 576 U.S. at 878, 135 S. Ct. at 2738, 192 L. Ed. 2d at 775 (affirming the denial of a claim of cruel punishment because the petitioners "fail[ed] to satisfy their burden of establishing that any risk of harm was substantial when compared to a known and available alternative method of execution").

---

[24] *See* Ala. Code § 15-18-82.1(a) (2018) ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia.").

Summarizing *Baze* and *Glossip*, the *Bucklew* Court explained,

> *Glossip* expressly held that identifying an available alternative is "a requirement of *all* Eighth Amendment method-of-execution claims" alleging cruel pain. . . . Distinguishing between constitutionally permissible and impermissible degrees of pain, *Baze* and *Glossip* explained, is a *necessarily* comparative exercise. To decide whether the State has cruelly "superadded" pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by "compar[ing]" that method with a viable alternative.

587 U.S. at 136, 139 S. Ct. at 1126, 203 L. Ed. 2d at 536 (quoting *Glossip*, 576 U.S. at 867, 135 S. Ct. at 2731, 192 L. Ed. 2d at 774) (first emphasis added in *Bucklew*; second emphasis original in *Bucklew*).[25]

---

[25] This relative component derives in part from the longstanding constitutional truth—upheld on multiple occasions by the Supreme Court and this Court—that the death penalty itself is constitutional. *See, e.g.*, *Bucklew*, 587 U.S. at 129, 139 S. Ct. at 1122, 203 L. Ed. 2d at 532 ("The Constitution allows capital punishment."); *Allen*, 266 S.C. at 186, 222 S.E.2d at 292 ("Under . . . any constitutionally sound interpretation of the Fifth, Eighth, and Fourteenth Amendments, it is clear that capital punishment does not violate the prohibition against cruel and unusual punishment."); *Allen*, 266 S.C. at 186-87, 222 S.E.2d at 292 (upholding the constitutionality of the death penalty under article I, section 15); *State v. Crowe*, 258 S.C. 258, 271, 188 S.E.2d 379, 385 (1972) (rejecting a claim that "the imposition of the death penalty constitutes cruel and unusual punishment in violation of both the State and Federal Constitutions"). The Supreme Court of the United States has instructed us that from this constitutional truth flows the principle that the constitution permits some means of carrying it out. A plurality of the Supreme Court explained—analyzing a claim that a particular protocol for lethal injection violated the Eighth Amendment—stating, "We begin with the principle, settled by *Gregg* [*v. Georgia*], that capital punishment is constitutional. It necessarily follows that there must be a means of carrying it out." *Baze*, 553 U.S. at 47, 128 S. Ct. at 1529, 170 L. Ed. 2d at 431 (citation omitted); *see also* 553 U.S. at 61, 128 S. Ct. at 1537, 170 L. Ed. 2d at 440 ("[T]he power of a State to pass laws means little if the State cannot enforce them." (quoting *McCleskey v. Zant*, 499 U.S. 467, 491, 111 S. Ct. 1454, 1469, 113 L. Ed. 2d 517, 543 (1991))).

This "*Baze-Glossip* test" is essentially a procedural opportunity for a condemned inmate to claim in federal court there is "a feasible and readily implemented alternative method of execution the State refused to adopt without a legitimate reason, even though it would significantly reduce a substantial risk of severe pain." *Bucklew*, 587 U.S. at 140, 139 S. Ct. at 1129, 203 L. Ed. 2d at 539. If an inmate proves there is such an available, alternative method, then he may have established an Eighth Amendment violation. In South Carolina, however, the 2021 amendments to section 24-3-530 make it unnecessary for this Court to adopt the *Baze-Glossip* test. This is because of the choice provisions in the section. If any condemned inmate in this State believes that any one of the three methods of execution now set forth in section 24-3-530 is unconstitutional, he has two other constitutional choices.

To further illustrate the point—that the element of choice significantly changes the constitutional analysis—we consider the *Dawson* and *Mata* decisions from Georgia and Nebraska. The inmates in this case rely on these decisions to support their argument that electrocution is unconstitutionally cruel. A careful examination of the opinions in those cases reveals, however, the reasoning of those courts was influenced by the lack of choice in the applicable statutes.

In *Mata*, the Supreme Court of Nebraska held "electrocution as a method of execution is cruel and unusual punishment in violation of the Nebraska Constitution." 745 N.W.2d at 279. Article I, section 9 of the Nebraska Constitution, the *Mata* court wrote, "mirrors the U.S. Constitution's Eighth Amendment," providing, "'Excessive bail shall not be required, . . . nor cruel and unusual punishment inflicted.'" 745 N.W.2d at 257 (quoting NEB. CONST. art. I, § 9). In 2008 when *Mata* was decided, Nebraska was the "only state in the nation to require electrocution as its sole method of execution." 745 N.W.2d at 263. The Supreme Court of Nebraska emphasized "we cannot ignore Nebraska's status as the last state to retain electrocution as its sole method of execution." 745 N.W.2d at 264. In *Dawson*, the Supreme Court of Georgia held "that future use of electrocution as a means of executing death sentences in Georgia would violate the prohibition against cruel and unusual punishment in . . . the Georgia Constitution," which also mirrors the Eighth Amendment. 554 S.E.2d at 139. Similar to Nebraska, Georgia employed electrocution as the sole method of carrying out the death penalty for crimes committed before May 1, 2000, as was Dawson's murder. *Id.* The Supreme Court of Georgia emphasized it was "influenced greatly" by the provision in the applicable statute that executions should be carried out by lethal injection if electrocution was declared unconstitutional. 554 S.E.2d at 140.

Both *Dawson* (2001) and *Mata* (2008) were decided at a time when states had little difficulty obtaining the drugs necessary to carry out an execution by lethal injection. *See Glossip*, 576 U.S. at 869-71, 135 S. Ct. at 2733-34, 192 L. Ed. 2d at 769-70 (noting the "practical obstacle" that drugs for lethal injection became unavailable "emerged" soon after *Baze* in 2008). Thus, at the time of both decisions, Georgia and Nebraska had "a feasible and readily implemented alternative method of execution" that would have—at least according to the inmates' theory of cruelty in this case—"significantly reduce[d]" the "substantial risk of severe pain" the inmates contend is associated with electrocution. *Bucklew*, 587 U.S. at 140, 139 S. Ct. at 1129, 203 L. Ed. 2d at 539. In the Georgia case, the legislature actually had adopted lethal injection for crimes occurring after May 1, 2000 and—as mentioned—in case electrocution was declared unconstitutional.

In *Dawson*, *Mata*, and essentially all of the litigation that has taken place over whether a particular method of execution is constitutional, the state made the choice as to which method to employ—giving no choice to the condemned inmate—and the question for the courts was whether the state's one chosen method is constitutional. In any one of those cases, the element of choice that South Carolina provides in section 24-3-530 would have changed the constitutional analysis.

In South Carolina in 2021, capital punishment had been shut down for years because of the unavailability of the drugs necessary to carry out the death penalty by lethal injection. Because the death penalty is constitutional, there is necessarily a constitutional method of carrying it out. *See supra* note 25. Stating this constitutional principle differently, the constitution will never prohibit all methods of execution; or, at least one available method is necessarily constitutional. The question faced by our General Assembly in 2021, therefore, was not whether South Carolina could carry out the death penalty in the face of the unavailability of the drugs necessary for lethal injection, but how. One option for the General Assembly would have been to simply designate electrocution, or the firing squad, as our sole method to carry out the lawful sentence of death.

By 2021, however, uncertainty had developed as to what is the least inhumane method of execution. There had been considerable criticism leveled at electrocution, as has been discussed thoroughly in this opinion. As to lethal injection, considerable concerns had been raised as to whether some protocols for it are unconstitutionally cruel. *See, e.g.*, *Glossip*, 576 U.S. at 949, 135 S. Ct. at 2780-81, 192 L. Ed. 2d at 823 (Sotomayor, J., dissenting) (stating that one protocol for lethal injection is "what may well be the chemical equivalent of being burned at the stake"). Even as to the protocol the inmates in this case concede is constitutional—a single dose of

pentobarbital—by 2021, multiple condemned inmates around the country filed constitutional challenges in federal courts, some of which were initially successful. *See, e.g.*, *Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, 471 F. Supp. 3d 209, 215, 218 (D.D.C.) (addressing a constitutional challenge by four condemned inmates to the federal government's "2019 Protocol" for lethal injection—"a single drug: pentobarbital sodium"—and finding, "The scientific evidence before the court overwhelmingly indicates that the 2019 Protocol is very likely to cause Plaintiffs extreme pain and needless suffering during their executions"), *vacated sub nom. Barr v. Lee*, 591 U.S. 979, 140 S. Ct. 2590, 207 L. Ed. 2d 1044 (2020).[26]  On the other hand, there had been considerable commentary on the lack of unnecessary or excessive pain associated with the firing squad, despite the fact—as Justice Sotomayor observed—some "might find [the firing squad] regressive."  With all of this uncertainty as what is, in fact, the least inhumane method of killing another man, "choice" was the constitutional answer.

As we wrote above—repeating long-established law—our standard for decision requires that we presume section 24-3-530 is constitutional; we must uphold the statute unless it is not possible to find it conforms to the constitution.  Under that standard, choice—like electrocution in 1912 and lethal injection in 1995—is fairly seen as innovation.  Far from being an effort to inflict pain, the choice provisions of section 24-3-530 are the General Assembly's sincere effort to make the death penalty less inhumane while enabling the State to carry out its laws.  In the context of the constitutional principle that our State may carry out the death penalty on those on whom it has been lawfully imposed, choice cannot be considered cruel because the condemned inmate may elect to have the State employ the method he and his lawyers believe will cause him the least pain.  In the same context, choice cannot be unusual because the article I, section 15 prohibition on "unusual punishment" was not intended to inhibit innovative efforts to make execution less inhumane.  Under the choice provisions of section 24-3-530, a condemned inmate in South Carolina will never be subjected to execution by a method he contends is more inhumane than another method that is available.  Under the constitutional standards set forth above, therefore, considering section 24-3-530 as a whole, the statute is constitutional.

---

[26] *See also Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1278 (11th Cir. 2015) ("[The inmate's] principal claim regarding the protocol is that Georgia's switch in March 2013 from using FDA-approved pentobarbital to compounded pentobarbital creates a substantial risk that the drugs used in her execution will cause her to suffer unnecessary and excruciating pain."); *Zink v. Lombardi*, 783 F.3d 1089, 1096 (8th Cir. 2015) (same).

**VII.   Conclusion**

We find section 24-3-530 of the South Carolina Code is constitutional.

**REVERSED.**

**JAMES, J., concurs.  HILL, J., concurring in a separate opinion.  BEATTY, C.J., concurring in part and dissenting in part in a separate opinion. KITTREDGE, J., concurring in part and dissenting in part in a separate opinion.**

**JUSTICE HILL:**  I concur in the results of Justice Few's majority opinion but write separately to state my views on several issues.

First, I address the standard of review.  When a court confronts a constitutional challenge to a statute, I agree that we must treat "legislative findings" different than findings of fact made by trial judges in routine cases.  Justice Few's discussion on this point is persuasive.  Much of the case law concerning legislative findings arises in the context of due process challenges to economic legislation, where a key issue is whether the legislation has a "rational basis."  The inmates' challenge here is based purely on Article I, §15 of the South Carolina Constitution.  Our inquiry is therefore different than one involving the rational basis test, or similar tests federal courts employ in deciding due process or equal protection claims arising under the federal constitution.

Second, in my view, the meaning of "cruel" as used in Article I, §15 is as follows: a punishment is cruel in the constitutional sense if it involves the deliberate infliction of severe pain to the death sentence by torture and the like, or that the method of punishment poses an objectively intolerable risk that such a level of pain will ensue.  I would adopt this test, which is largely distilled from Supreme Court precedent as noted in the plurality opinion of Chief Justice Roberts and the concurring opinions of Justices Scalia and Thomas in *Baze*.

Third, in my view, the meaning of the word "unusual" as used in Article I, §15 is: a punishment is unusual in the constitutional sense if it is so unconventional as to be not only inhumane, but bizarre or strange.  I agree with Justice Kittredge and Chief Justice Beatty that Article I, §15 gives broader protection than the Eighth Amendment due to our state constitution's use of the disjunctive.  The framers of both our federal and state constitutions were concerned with punishments that were unduly extreme or harsh.  They chose the words they did to ensure the government could not impose punishments that went so far beyond what is necessary to accomplish the execution that it becomes sadistic or perverse.  A punishment is not unusual merely because it is rarely used or even if it has fallen into disuse.  The firing squad does not meet this definition of unusual.  It is not so bizarre or strange as to violate the Constitution.

I cannot join either Justice Few's or Justice Kittredge's reasoning regarding "unusual."  Both make logical leaps concerning the beliefs of South Carolina's citizens based on what is, at least to me, insufficient evidence.  However, I do agree with Justice Kittredge that the "choice" option in § 24-3-530 of the South Carolina Code (Supp. 2023), is not relevant to determining whether a specific method of

execution is unconstitutional.  I further agree with his sound observations in footnote 8 of his separate opinion.

I disagree with Justice Few's opinion that to show a method of execution is "unusual," the inmate must prove that the method is "out of use because it has been rejected by the citizenry."  I believe all members of the Court agree that hanging is unconstitutional, but under the test proposed by Justice Few, that would be in doubt absent proof of specific rejection of hanging by South Carolina citizens.  Justice Few states the people "rejected hanging as a policy determination for its barbaric qualities."  This statement rests on an enormous assumption that the legislature's policy choice was also a conscious choice to reject all other methods.  Even more troubling, it would seem that under Justice Few's test that once the legislature approves a method of execution, it would be impossible for an inmate to show the method has since been rejected by the people.  That is the very reason the framers added the protection against cruel and unusual punishment to the Constitution as part of the Bill of Rights.  *See* 2 *Elliot's Debates on the Constitution* at 111 (1836) ("Congress has to determine what kind of punishment shall be inflicted on persons convicted of crimes.  They are now here restrained from inventing the most cruel and unheard of punishments, and annexing them to crimes; and there is no constitutional check on them, but that racks and gibbets may be among the most mild instruments of their discipline." (quoting Statement of Abraham Holmes at Massachusetts Ratifying Convention, January 30, 1788)); *see also* 3 *Elliot's Debates on the Constitution* at 442-48, 451-52 (1836) (similar statements by Patrick Henry at Virginia Ratifying Convention urging adoption of prohibition against cruel and unusual punishments as enshrined in Virginia's Declaration of Rights and arguing that Congress should not be allowed to "define punishments without this control").  These same considerations informed Article I, §15 of the South Carolina Constitution.

Fourth, there is no reason for us to address the "evolving standards of decency" issue in this case.  The "evolving standard of decency" language is much-maligned and has become a loaded term.  The phrase appeared in *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) ("[T]he words of the [Eighth] Amendment are not precise, and that their scope is not static.  The Amendment must draw from its meaning from the evolving standards of decency that mark the progress of a maturing society.").  The Court in *Trop* recognized the obvious: that the terms "cruel" and "unusual" are inherently vague.

During the debates on adopting the Bill of Rights during the First Congress in 1789, Representative William Loughton Smith of Charleston, who was educated at

London's Middle Temple Bar, "objected to the words 'nor cruel and unusual punishment; the import of them being too indefinite." 1 *Annals of Congress: The Debates and Proceedings in the Congress of the United States* at 754 (1834). Samuel Livermann of New Hampshire joined the objection, noting that although "the clause seems to express a great deal of humanity . . . it seems to have no meaning in it . . . ." He did not think the clause necessary and believed it would unduly restrict Congress' power to define punishments. *Id*. Nevertheless, the amendment "was agreed to by a considerable majority." *Id*.

Courts must often interpret vague constitutional words. But no one would plausibly contend that any punishment that existed at the time the Constitution was adopted cannot now be considered "cruel" or "unusual."

In 1778, a committee chaired by Thomas Jefferson issued a proposal to reform Virginia's criminal laws to make them more humane and reduce the number of offenses punishable by death. Gaye Wilson, Bill 64, TheJeffersonMonticello (May 1999), https://www.monticello.org/research-education/Thomas-jefferson-encyclope dia/bill-64/. Still included among the punishments in his proposal were hanging, gibbeting, the pillory, castration, death by poison, and the cutting of the cartilage of the nose in "a hole of one-half inch diameter at the least." *Id*. The proposal was rejected by the Virginia General Assembly. Reporting to Jefferson in Paris, James Madison wrote that the defeat was due to the "rage against horse stealers" who, in the "old bloody code" that was retained, faced the death penalty. *Id*.

The point is that not even ardent originalists promote the view that the "cruel and unusual" punishment clause must be decided by 18th century standards of decency. *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 861 (1989) (Even if it could be shown that public whipping or branding were not considered cruel and unusual in 1791, today they "would not be sustained by our courts, and any espousal of originalism as a practical theory of exegesis must somehow come to terms with that reality.").

Justice Few's opinion rejects the idea that the "evolving standard of decency" standard should apply in interpreting Article I, §15. He maintains the "'standard' is the definition of 'cruel,' which has not changed over time." He admits, though, that, "The information and evidence to which we apply the standard does change, and such a change may render a different outcome of a constitutional analysis as the information used in that analysis 'evolves.'" Presumably, the information we should use includes the contemporary sense of what current society deems to be cruel or unusual.

History, custom, and tradition can be essential to understanding many of the vague and open-ended terms used in our constitutions. But courts must guard against a mindless methodology that, as Chief Justice Roberts recently wrote, treats a law as "trapped in amber." *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024). Instead, it is often helpful–and necessary–to consider the principle underlying the constitutional right to help determine the contours of the right and to then use common sense to apply it to the facts. *Id*. at 1925 (Barrett, J., concurring) ("[E]vidence of 'tradition' unmoored from original meaning is not binding law.").

All of this is to say that when the framers left us with vague terms, they intentionally left interpretation of those terms to the only true power courts have in our republic: our judgment. *The Federalist No. 78* (Alexander Hamilton); *see also Thompson v. Oklahoma*, 487 U.S. 815, 833 n.40 (1988) ("That the task of interpreting the great, sweeping clauses of the Constitution ultimately falls to us has been for some time an accepted principle of American jurisprudence. . . . With the Eighth Amendment, whose broad, vague terms do not yield to a mechanical parsing, the method is no different."). There are many interpretative tools we may use in exercising our judgment, and in judging broad terms, sometimes no universal waypoint exists. The law is not, to borrow from Justice Holmes, some "brooding omnipresence in the sky" that always provides clear answers. *See Southern Pac. Co. v. Jenson*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting). We should recognize this reality, and appreciate that judging is not capable of being done by a "mere machine." Letter from Thomas Jefferson to Edmund Pendleton (August 26, 1776).

<u>Fifth</u>, I agree with Justice Few's excellent §V, except I would not reach the issue addressed in footnote 23.

<u>Sixth</u>, as to §VI, I would find the inmates' statutory choice argument is abandoned due to the cursory briefing it received, but even if it was not abandoned, I would find it raises no meritorious constitutional claim.

<u>Seventh</u>, as to the entire majority opinion and particularly §VI, I would urge that we on this Court continue distancing ourselves from the *Baze-Glossip-Bucklew* test. As Justices Scalia and Thomas noted in their *Baze* concurrence, this novel reformation of the test for cruel and unusual punishment is far afield from the original understanding of the Eighth Amendment. *Baze v. Rees*, 553 U.S. 35, 87–107 (2008) (Scalia and Thomas, J.J., concurring).

As I understand it, the *Baze-Glossip-Bucklew* test requires that to prevail on an Eighth Amendment claim the inmate must prove that the method of execution

deliberately inflict severe pain beyond what is necessary to cause death (or creates an objectively intolerable risk that such a level of pain will ensue). In my view, so far so good. But the test is two-pronged, and the second requires the inmate to prove there is also a known and available alternative method of execution that does not pose a risk of inflicting such a level of pain. As the majority put it in *Bucklew*, to win his Eighth Amendment case the condemned prisoner must identify "a feasible and readily implemented alternative method of execution the State refused to adopt without a legitimate reason, even though it would significantly reduce a substantial risk of severe pain." *Bucklew v. Precythe*, 587 U.S. 119, 140 (2019). This has been termed the "relative component" of the analysis of Eighth Amendment method of execution challenges. This remarkable transformation of the meaning of "cruel and unusual" is not one we should emulate when construing Article I, §15. This remodeling of Eighth Amendment precedent is adorned by a clumsy syllogism– "[C]apital punishment is constitutional. . . . It necessarily follows that there must be a means of carrying it out." *Baze*, 553 U.S. at 47. Perhaps to some, this may sound good, but it is not logically good or sound. The question in deciding whether a specific method of punishment is unconstitutionally cruel should always be whether that method of punishment at issue is cruel. Methods of punishment that are categorically cruel do not become less so because there is no readily available alternative method. *See id.* at 101–02 (Thomas, J., concurring) ("It strains credulity to suggest that the defining characteristic of burning at the stake, disemboweling, drawing and quartering, beheading, and the like was that they involved risks of pain that could be eliminated by using alternative methods of execution.").

As Justices Scalia and Thomas predicted, the *Baze-Glossip-Bucklew* repackaging of the Eighth Amendment is proving unworkable. It has introduced even more subjective terms into death penalty litigation, such as "feasible," "readily implemented," "significant," and "legitimate." *Id.* at 105. This, in turn, invites more litigation. And as they also forecast, the "relative component" test forces federal courts to compare methods of execution, a task they can only accomplish by engaging at length with scientific and medical concepts "that are largely beyond judicial ken." *Id.* That is why the majority in *Bucklew* had to spend pages sheepishly discussing a "horse study" about equine euthanasia and "isoelectric EEGs." 587 U.S. at 146–47.

We should be careful not to make the same mistake in interpreting the South Carolina Constitution's punishment clause.

**CHIEF JUSTICE BEATTY:** I concur in part and dissent in part. Four inmates who received capital sentences ("Inmates") have filed this declaratory judgment action challenging the constitutionality of South Carolina's death penalty statute, section 24-3-530, after it was amended in 2021 to make electrocution, rather than lethal injection, the default method of execution and to add the firing squad as a third method of execution. *See* S.C. Code Ann. § 24-3-530 (Supp. 2023). Inmates challenged the statute in its entirety on the grounds it violates the void-for-vagueness and nondelegation doctrines, state and federal prohibitions on ex post facto laws, and the statutory right to elect the method of execution. In addition, Inmates specifically challenged two of the three methods of execution set forth in the statute, electrocution and the firing squad, on the basis they violate the ban against cruel, corporal, or unusual punishment contained in article I, section 15 of the South Carolina Constitution. The circuit court declared section 24-3-530 to be unconstitutional and specifically enjoined the use of electrocution and the firing squad as methods of execution in South Carolina.

I agree with the majority's determination that section 24-3-530 is not unconstitutional in its entirety. However, I respectfully disagree with the majority's failure to affirm the circuit court's determination that execution by electrocution and the firing squad violate our state's constitutional ban against cruel, corporal, or unusual punishment. In my view, the evidence in the record supports the circuit court's factual findings in this regard, and the circuit court correctly applied state law in concluding these two methods of execution are unconstitutional. Accordingly, my analysis will focus on these two methods of execution.

## I.  Introduction

A few observations are appropriate at the outset regarding our state constitution, the role of evolving standards of decency in evaluating the challenged punishment, and our standard of review.

## A.  South Carolina Constitution

Inmates' specific challenge to the constitutionality of electrocution and the firing squad is based on state law. The South Carolina Constitution uses "nor" in the disjunctive to ban punishment that is "cruel" or "corporal" or "unusual." As a result, if the punishment violates any *one* of these three independent prohibitions, it is unconstitutional:

Excessive bail shall not be required, nor shall excessive fines be imposed, *nor shall cruel, nor corporal, nor unusual punishment be inflicted*, nor shall witnesses be unreasonably retained.

S.C. Const. art. I, § 15 (emphasis added).

The circuit court found our state constitution provides a second layer of protection, and a greater level, than the provision in the Eighth Amendment to the United States Constitution banning "cruel and unusual punishments."[27] I agree with the circuit court, as our state constitution prohibits not only "cruel" or "unusual" punishment, but also "corporal" punishment; its language making any of these characteristics unacceptable is broader than the prohibition set forth in the United States Constitution, which does not expressly refer to corporal punishment; and a state's constitution may be interpreted in a more expansive manner to afford more protection than the United States Constitution, even when the provisions are similarly worded, as the provisions in state constitutions ultimately provided the foundation for the creation of a federal constitution.

The foregoing principles have long been recognized in our law. *See, e.g.*, *State v. Austin*, 306 S.C. 9, 16, 409 S.E.2d 811, 815 (Ct. App. 1991) ("It is firmly established that state courts may interpret their own constitutions in such a way as to expand rights conferred by the Federal Constitution. The principle of federalism envisions two separate and independent judicial systems: federal courts, which construe federal law, and state courts, which construe state law. State courts may, therefore, develop state law to provide their citizens with a second layer of constitutional rights." (footnotes omitted)); *see also State v. Brown*, 284 S.C. 407, 411, 326 S.E.2d 410, 412 (1985) (holding castration, which the Court described as "a form of mutilation," constituted cruel or unusual punishment that is prohibited by article I, section 15 of the South Carolina Constitution, even though such punishment had been deemed permissible in other jurisdictions under an Eighth Amendment analysis); William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501–02 (1977) (observing that, although it is often assumed that state law follows federal constitutional provisions, particularly when the language is identical, historically, the opposite is actually true, as the

---

[27] *Cf.* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*." (emphasis added)). South Carolina also appears to be unique among state jurisdictions in its prohibition against corporal punishment as part of a criminal sentence.

federal constitution was drawn from provisions in existing state constitutions that had been independently interpreted in those state courts without reference to the adoption of the federal provisions).

These principles have also formed the basis for this Court's observation that the United States Constitution represents the floor, not the ceiling, of state-provided protections. *See State v. Forrester*, 343 S.C. 637, 643, 541 S.E.2d 836, 840 (2001) (stating the United States Constitution "sets the floor for individual rights while the state constitution establishes the ceiling"). This Court should remain cognizant of the elevated nature of the protections available under our state constitution when considering the questions presented in this appeal.

## B.     Evolving Standards of Decency

I next note the State maintains this Court should not rely on the "evolving standards of decency that mark the progress of a maturing society" in evaluating whether the two challenged execution methods are unconstitutional. *See generally State v. Pittman*, 373 S.C. 527, 562, 647 S.E.2d 144, 162 (2007) ("As this Court has recognized, what constitutes cruel and unusual punishment, and thus, what violates the Eighth Amendment, is determined by 'evolving standards of decency that mark the progress of a maturing society.'" (quoting *State v. Standard*, 351 S.C. 199, 204, 569 S.E.2d 325, 328 (2002)).

This framework has been used by the United States Supreme Court to evaluate whether punishment is cruel and unusual in violation of the United States Constitution. The sentiment for this framework was originally expressed by the Supreme Court over a century ago. *See Weems v. United States*, 217 U.S. 349, 373 (1910) ("Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. . . . In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be."); *id.* at 378 ("The [cruel and unusual punishment] clause of the Constitution, in the opinion of the learned commentators, may be therefore progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice."); *see also Pittman*, 373 S.C. at 562 n.4, 647 S.E.2d at 162 n.4 (citing *Weems* and observing "[t]his has become the touchstone of Eighth Amendment jurisprudence").

The United States Supreme Court further refined and articulated this standard well over half a century ago, and it has applied it in capital cases. *See Trop v. Dulles*,

356 U.S. 86, 101 (1958) (holding "the [Eighth] Amendment [banning cruel and unusual punishment] must draw its meaning from the evolving standards of decency that mark the progress of a maturing society"); *see also Furman v. Georgia*, 408 U.S. 238 (1972) (applying the evolving standards of decency to allegations of cruel and unusual punishment in the context of capital punishment).

Nevertheless, the State maintains this framework should be limited to challenges under the United States Constitution and rejected for challenges premised on the South Carolina Constitution. The State asserts this Court should, instead, look to "originalism" and how punishments were historically viewed when assessing if they are inhumane, and it further asserts Inmates should be required to establish there is another more humane method of execution before being permitted to allege that a particular method is inhumane. I strongly reject the State's contentions in this regard, which aim to effectively make the protection against improper punishment under the South Carolina Constitution significantly weaker than the protection afforded by the United States Constitution.

The broad language used in the South Carolina Constitution inherently contemplates that the terms must be evaluated in a particular context and in light of the inevitable changes in knowledge, societal norms, and other developments that occur over time. Commentators have often distinguished specific terms, such as "shall" or "must," which generally have only one understood meaning, from broader terms such as those used in article I, section 15 of our state constitution. The latter are meant to encompass an indeterminate variety of punishments, including those that are yet to be developed over future generations. There is no reason to believe that the founders intended a punishment's classification as "cruel," for example, to be permanently fixed upon the views of one generation at an arbitrary point in time of fifty, one hundred, or two hundred years ago.

Moreover, from a practical standpoint, the use of originalism does not remove the element of judicial interpretation (or, as the majority fears, potential bias) present in answering the question, so in these circumstances, originalism holds no special advantage. For example, even using the concept of originalism, the Court would need to decide whether the ban on "cruel" punishment should be based on our collective judgment today of its meaning in 1790, 1865, 1868, 1895, or perhaps 1971.[28] There is rarely documentary evidence to definitively support one clear

---

[28] The 1790 Constitution contained a prohibition on "cruel punishments." *See* S.C. Const. art. IX, § 4 (1790). The constitution adopted in 1865 following the Civil War retained the language banning "cruel punishments," although it was moved to

answer upon which all jurists will unfailingly agree. Additionally, there can be no proof of the founders' opinion of punishments about which they had no knowledge. When punishments once deemed appropriate are no longer countenanced, what changes is not the innate cruelty of the punishments, but society's perception of them. The broad terms used in the South Carolina Constitution must be capable of this necessary evolution to give full effect and meaning to their protections, and doing so is in harmony with the founders' original intent of prohibiting punishments that society deems cruel, corporal, or unusual. *See generally Weems*, 217 U.S. at 377–78 (noting an example of this evolution is that while some courts once found the punishment of whipping to be "odious, but not unusual" in comparison to the "barbarities of quartering, hanging in chains, castration, etc.," the same punishment was later held to be cruel and unusual (citation omitted)).

As noted at the outset, this Court has repeatedly characterized the South Carolina Constitution as providing a second layer of protection to its citizens and has explained that this Court may, therefore, interpret our state constitution more broadly than similar or even identical provisions in the United States Constitution. This point accords with the fact that the constitutions of individual states were subject to individual state interpretation before many similar or identical provisions in them formed part of the United States Constitution. *See* Brennan, *supra*, at 501–02. The recognition of this additional protection is also supported by this Court's observation that the United States Constitution "sets the floor for individual rights while the state constitution establishes the ceiling." *See Forrester*, 343 S.C. at 643, 541 S.E.2d at 840.

---

another section. *See* S.C. Const. art. IX, § 5 (1865). The 1868 Constitution changed the language to "cruel and unusual punishment" in a new article and added a ban on "corporal punishment" in a separate section within that article. *See* S.C. Const. art. I, § 38 (1868) (prohibiting "cruel and unusual punishment"); *id.* art. I, § 16 (prohibiting "corporal punishment"). The 1895 Constitution rearranged these provisions and placed them together in one section for the first time. *See* S.C. Const. art. I, § 19 (1895) (banning the infliction of "cruel and unusual punishments" and "[c]orporal punishment"). The 1895 Constitution was later updated following work by the West Committee, and the current provision in article I, section 15 was approved in 1971 that replaces "and" with "nor," thus making the three prohibitions independently operative. *See* S.C. Const. art. I, § 15 (prohibiting the imposition of excessive bail and fines and stating "nor shall cruel, nor corporal, nor unusual punishment be inflicted").

Although the majority acknowledges that this Court has repeatedly applied the "evolving standards of decency" in our Eighth Amendment cases under the United States Constitution, in a footnote it accepts the State's arguments that this standard should be rejected for challenges based on the South Carolina Constitution. The majority also declines to determine the extent to which article I, section 15 provides "more protection" than the Eighth Amendment, reasoning Inmates did not make an Eighth Amendment argument here. In my view, holding this Court will not apply evolving standards of decency for state claims is illogical. Inmates should not be required to allege an Eighth Amendment violation to obtain the fullest measure of protection afforded under state law. More importantly, however, rejecting consideration of the evolving standards of decency when determining the limits of acceptable punishment results in our state constitution affording notably *less* protection to its citizens, not an *additional* layer or *greater* level of protection. This arbitrarily places South Carolina's level of protection *beneath* the minimal "floor" required by the United State Constitution—lowering it to the basement.[29]

Other state courts have also recognized that their state constitution provides a greater level of protection than the United States Constitution and have found no reason to depart from the "evolving standards of decency" used by the United States Supreme Court when they evaluate allegations of "cruel" and/or "unusual" punishments under their state constitutions. For example, the North Carolina Supreme Court recently found that it "is clear from the plain meaning of both terms [] that determining whether a punishment is 'cruel' or 'unusual' requires a contextual inquiry, the results of which may change over time as society evolves." *State v. Kelliher*, 873 S.E.2d 366, 385 (N.C. 2022). The North Carolina court stated it was persuaded "there is no reason to depart from the basic Eighth Amendment analytical framework as articulated by the United States Supreme Court," so it would "draw the meaning of [its state constitution] 'from the evolving standards of decency that mark the progress of a maturing society'" and consider "objective indicia of society's standards" when exercising its own judgment to decide whether the punishment is unconstitutional. *Id.* (citations omitted). The Supreme Court of Nebraska previously reached a similar conclusion. *See, e.g., State v. Mata*, 745 N.W.2d 229, 256 (Neb.

---

[29] The majority cites *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019), in which the United States Supreme Court commented that the Eighth Amendment bars forms of punishment that intensify the sentence of death with a cruel superaddition of terror, pain, or disgrace. In my view, this observation is not incompatible with consideration of the "evolving standards of decency" that have formed part of the Supreme Court's discussions, in some form, for over a century.

2008) ("We conclude that evolving standards of decency are applicable to method-of-execution challenges.").

Because evolving standards of decency mark the progress of a maturing society, the fact that a method was previously upheld does not mean that it would pass constitutional muster today, a point the United States Supreme Court has specifically recognized:

> Our society has [] steadily moved to more humane methods of carrying out capital punishment. The firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods, culminating in today's consensus on lethal injection. . . . [O]ur approval of a particular method in the past has not precluded legislatures from taking the steps they deem appropriate, in light of new developments, to ensure humane capital punishment.

*Baze v. Rees*, 553 U.S. 35, 62 (2008). I agree with the foregoing observation and am not persuaded there is any justification for South Carolina affording less protection to its citizens.[30]

## C.    Standard of Review

It is also important to clarify the lens through which the Court must view this case. This action was brought seeking a declaration that South Carolina's death

---

[30] The State also asserts Inmates should be required to provide an alternative means of execution that they assert is more humane because they bear the burden of establishing a constitutional violation. While a comparison of other existing methods of execution can be part of any analysis, I disagree that a burden should be placed upon Inmates to envision and create the mechanism for carrying out a constitutional death sentence. That burden must, of necessity, lie with the State. The burden of Inmates is to prove that the methods they are contesting are indeed cruel, corporal, or unusual. Under the State's scenario, in the event there were currently no other humane methods then available, Inmates would automatically lose a challenge to even the most heinous of execution methods. The engrafting of this alleged requirement does not logically flow from the text of the South Carolina Constitution itself, and such a construction by this Court would result in an abdication of our duty to uphold the protections in our state constitution.

penalty statute, section 24-3-530, is unconstitutional following its amendment in 2021.

"A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Felts v. Richland Cnty.,* 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). This appeal presents mixed questions of law and fact. The parties dispute the constitutional validity of a statute, which ultimately presents a question of law that this Court may decide de novo, without deference to the circuit court. *See, e.g., State v. Mata*, 745 N.W.2d 229, 267 (Neb. 2008) ("The ultimate issue, whether electrocution violates the constitutional prohibition against cruel and unusual punishment, presents a question of law."); *Catawba Indian Tribe of S.C. v. State*, 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007) (observing questions of law may be decided by this Court with no particular deference to the circuit court). "The party challenging the validity of a statute bears the burden of proving it is unconstitutional." *Powell v. Keel*, 433 S.C. 457, 461, 860 S.E.2d 344, 346 (2021). A statute is presumed constitutional, and its repugnance to the constitution must be clear and beyond a reasonable doubt. *State v. Neuman*, 384 S.C. 395, 402, 683 S.E.2d 268, 271 (2009).

However, "[w]hether a method of inflicting the death penalty inherently imposes a significant risk of causing pain in an execution is a question of fact." *Mata*, 745 N.W.2d at 267. Factual findings of the circuit court are entitled to deference if this Court concludes there is evidence in the record to support them. *See generally Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018) (clarifying, in a civil action for post-conviction relief, that this Court defers to the circuit court's "findings of fact and will uphold them if there is evidence in the record to support them," but reviews questions of law de novo); *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) ("In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings."), *abrogated on other grounds by In re Est. of Kay*, 423 S.C. 476, 816 S.E.2d 542 (2018).

The majority appears to vitiate the traditional principle of deference to the circuit court's factual findings, implying the standard becomes nearly irrelevant when there is a constitutional challenge and that this Court should, instead, defer to either existing or "presumed" factual findings made by the legislature, although it acknowledges there may be circumstances where no such findings have been made. As I read the majority's opinion, it essentially opines there is a conflict between existing (or presumed) legislative findings and the circuit court's factual findings

here, so the legislative findings, presumed or otherwise, must prevail. In my view, the majority has read the circuit court's role in this matter too narrowly. The majority relies, in part, on this Court's statement "that there are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment." *Richards v. City of Columbia*, 227 S.C. 538, 560–61, 88 S.E.2d 683, 694 (1955). To this statement, however, the Court added that "the better rule" is that such findings, if any, are not conclusive, and it noted the role of judicial review in evaluating extrinsic evidence along with any such "legislative" findings:

> However, *by the better rule*, such implied or express finding *is subject to judicial review, and the court may consider extrinsic evidence for this purpose*, although the statute will not be held unconstitutional unless such (legislative) finding is clearly erroneous.

*Id.* at 561, 88 S.E.2d at 694 (emphasis added).

In this case, the legislature has made no clear factual findings on the levels of pain or mutilation caused by the methods of execution, or any other relevant points that factor into an analysis of whether a particular method of execution is cruel, corporal, or unusual. These are the factual findings made by the circuit court and which this Court addresses here. Accordingly, I see no basis for abandoning the traditional principle of deference to the circuit court's factual findings, while reviewing the record for the necessary support. In my opinion, the circuit court properly acted within its jurisdiction in conducting a trial, hearing the witnesses, and rendering a decision on its findings, and it should be duly recognized as the finder of fact in this dispute.

With these points as guides, the remainder of this opinion will consider the conclusions of the circuit court regarding the ban on punishment that is (1) unusual, (2) cruel, or (3) corporal in the context of both the firing squad and electrocution, although there is occasionally some overlap among these classifications.

## II. Ban on Unusual Punishment

The State has challenged the circuit court's conclusion that two of the methods of execution under section 24-3-530, the firing squad and electrocution, are unusual punishments that are unconstitutional under state law. *See* S.C. Code Ann. § 24-3-

530 (Supp. 2023). In my view, the circuit court did not err in its determination, so I dissent from the majority opinion as to this issue.

## A. Firing Squad

The circuit court concluded the firing squad is an unusual punishment both in South Carolina and nationally. Among its findings, the circuit court stated it was undisputed that the firing squad has *never* been used in South Carolina as a method of execution or non-military punishment since the state's founding in 1788. The circuit court considered this point particularly notable in light of the fact that the concept of the firing squad is not a newly created or newly discovered means of execution. Thus, by adopting the firing squad, it found South Carolina was effectively going backwards to an outmoded form of execution that has never been utilized in most jurisdictions of the United States.

The circuit court noted that an expert in forensic pathology, Dr. D'Michelle DuPre, who was also a former medical examiner, testified about the use of the firing squad. Dr. DuPre reported that her research confirmed that less than one percent of executions in the United States have ever been carried out by the firing squad, that only thirty-four such executions have occurred since 1900, and during that time— over 120 years—all but one of those executions occurred in just one state, Utah. The circuit court also highlighted the observation made by the United States Supreme Court in 1878, nearly a century and a half ago, that death by firing squad historically has been limited to the realm of military punishment. *See Wilkerson v. Utah*, 99 U.S. 130, 135 (1878) ("Soldiers convicted of desertion or other capital military offences are in the great majority of cases sentenced to be shot."). *Wilkerson* and other authorities indicate the military's use of the firing squad was primarily to impose severe punishment for acts such as desertion, treason, mutiny, and espionage, and it was not used for civilians. In finding the firing squad is a disfavored method of execution nationally, the circuit court also noted a United States Supreme Court justice's observation made over half a century ago that shooting had virtually ceased to be a means of execution in the United States following the adoption of what were considered to be more humane methods of execution. *See Furman v. Georgia*, 408 U.S. 238, 296–97 (1972) (plurality opinion) (Brennan, J., concurring).

The State argues that infrequency of use, standing alone, is not the standard for judging whether a punishment is unusual because, if that were the case, any new method of execution could be deemed unusual and constitutionally infirm. I agree with this statement. However, the circuit court's analysis was not so narrow. Rather, the court based its reasoning on the additional key factor that the firing squad has

been known about for well over a century and, yet, virtually all jurisdictions, including South Carolina, have overwhelmingly eschewed this method of execution in the belief that it was less humane than other methods. In my opinion, the near-universal rejection or avoidance of a long-known execution method qualifies the method as constitutionally "unusual" punishment under any reasonable understanding of the term. The firing squad has obviously been an undesirable method of civilian punishment in the United States, despite its early use for military punishment, as evidenced by the fact that, for many years, Utah was the only state in the nation that allowed it. Utah's lone status in this regard has been attributed to a faith-based (Mormon) belief, arising in the 19th century, of the need for blood atonement for certain sins, although that view was later repudiated by faith leaders.

In 2021, when South Carolina amended its death penalty statute, it joined only three other states (Utah, Mississippi, and Oklahoma) that permitted execution by firing squad. *See Methods of Execution*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/methods-of-execution (last visited June 6, 2024). Further, although the firing squad has been viewed historically as a military punishment, the Death Penalty Information Center indicates that the United States Military and the United States Government now designate lethal injection as their method of execution. *Id.* Since the end of the Civil War, only one military service member has been executed by a firing squad, and it occurred in France during World War II. *See This Day in History Jan. 31, 1945, The Execution of Pvt. Slovik*, History.com, https://www.history.com/this-day-in-history/the-execution-of-pvt-slovik (stating U.S. Army Private Edward Donald Slovik was the last United States military service member executed by firing squad, in 1945, based on a charge of desertion). I note the last execution of a military service member by any method was in 1961, and it was by hanging, not a firing squad. *Military Facts and Figures*, Death Penalty Information Center, https://deathpenaltyinfo.org/state-and-federal-info/military/facts-and-figures (last visited June 6, 2024).

In my view, the circuit court did not err in finding the firing squad has been—and remains—an unusual method of execution in the United States. I say it "remains" unusual because, after South Carolina added the firing squad and the circuit court issued its decision, Idaho became only the fifth state to allow it, in 2023, but it did so due to the difficulties the state encountered in purchasing drugs for lethal injection. However, lethal injection has remained the primary method of execution in four of the five states authorizing the firing squad, including Idaho; South Carolina is the sole exception. *See Methods of Execution*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/methods-of-execution (last visited June 6, 2024) (noting in four of the five states allowing the firing squad, lethal injection still

remains the primary method of execution, but in South Carolina, electrocution has recently been designated the primary method).

Moreover, a closer inspection of the law in one of those states where the firing squad is authorized, Oklahoma, reveals that it makes the firing squad permissible only as a last (fourth) resort if three other statutory methods of execution preceding it are first declared to be either unconstitutional or unavailable. Specifically, Oklahoma law makes lethal injection the state's primary method of execution, followed by nitrogen hypoxia, electrocution, and the firing squad, *in that precise order*, and a particular method is deemed permissible only if all of the preceding methods in the list are unconstitutional or unavailable. *See* 22 Okla. Stat. Ann. § 1014 (Westlaw 2024) ("Manner of inflicting punishment of death."). As a result, the firing squad may be used *only* when lethal injection, nitrogen hypoxia, and electrocution are *all* determined to be unconstitutional or unavailable. Oklahoma's strict limitation on the use of the firing squad, which is clear from the statute itself, evinces Oklahoma's reluctance to rely on it as the primary or even a "usual" method of execution in that state.

The majority in this appeal, however, has determined the firing squad is not unusual. It does so based on a unique framework it has articulated by which a punishment must not only be statistically rare, but also the reason for its lack of use must be that the citizens of South Carolina have disfavored or rejected the punishment before it can be deemed unconstitutional in this state. The majority opines South Carolina has not necessarily been averse to the firing squad; rather, it simply was not considered or needed as an option until the drugs for lethal injection became difficult to procure, so the firing squad does not qualify as unusual under this custom-made standard.

As an initial point, I do not believe South Carolina's legislature or its citizens must first acknowledge that a punishment is disfavored for this Court to perform its judicial obligation to assess the constitutional validity of a method of punishment. In other words, a state may not insulate an otherwise unconstitutional punishment from scrutiny by its abject failure or refusal to recognize the evidence of its widespread repudiation or avoidance elsewhere. The majority's framework creates a hurdle that is impossible to overcome. The relevant information for consideration, therefore, must logically extend beyond our state borders to jurisdictions throughout the United States. For example, our legislature or citizens need not overtly concede that burning at the stake and public stoning are inhumane forms of punishment for this Court to conclude that they are disfavored in the United States and violative of our state constitution's ban on cruel, corporal, or unusual punishment. Justice

Kittredge and I have engaged in a similar analysis in this particular regard, and I agree with his statement that many colonial-era punishments are "patently unconstitutional," despite the lack of a South Carolina-specific repudiation of them. Accordingly, I agree with his rejection of the majority's framework and his suggestion to implement a framework that recognizes the long disuse of a known method of punishment may be fairly attributable to South Carolina's rejection of that method.

To the extent the majority opines South Carolina simply failed to give the firing squad any consideration until the drugs for lethal injection were not available, this misapprehends the true significance of South Carolina's failure to implement the firing squad at any time in its history from its statehood in 1788. I agree with the majority that the lack of lethal injection drugs was the catalyst for the legislature's search in 2021 for alternatives. However, I have no doubt, as found by the circuit court, that the reason for the firing squad's rarity is because it has been disfavored throughout our nation's history, and its use has been limited almost exclusively to the military and the state of Utah. Our legislature was unquestionably aware of that fact and no legislature in South Carolina, until 2021, ever instituted the firing squad as a method of execution. In any event, the State has informed this Court that it now has the drugs needed for lethal injection. Consequently, the lack of the necessary drugs for lethal injection is no longer a relevant factor explaining the decision to authorize the firing squad in this state.

The majority also indicates the firing squad should not be deemed unusual because it is not a "required" method; rather, it is one of three "choices" under the statute, and a "choice" can never be "unusual." I disagree. The issue here is whether a particular method of execution is unusual punishment and is banned by our state constitution. If the statute offered a "choice" of public stoning or lethal injection, we would have no problem discerning that public stoning is unconstitutional. Each choice is to be measured on its own merits.

In my opinion, the circuit court did not err in finding the firing squad has been—and continues to be—an unusual method of punishment and that it is unconstitutional under South Carolina law. For this reason, I dissent from the majority's holding on this issue. Because our views align in this regard, I concur with Justice Kittredge's separate opinion, which similarly rejects the framework for considering "unusual" punishment and concludes, as I do, that the firing squad is unusual punishment.

## B.    Electrocution

South Carolina was the eighth state to adopt electrocution in 1912. It was intended to replace another method that had become disfavored—hanging. *See* Act No. 402, § 1, 1912 S.C. Acts 702 ("*Be it enacted* by the General Assembly of the State of South Carolina, That after the approval of this Act by the Governor all persons convicted of capital crime and have imposed upon them the sentence of death shall suffer such penalty by electrocution within the walls of the State Penitentiary, at Columbia, under the direction of the Superintendent of the Penitentiary instead of by hanging.").

The circuit court noted SCDC still has the same electric chair that it purchased in 1912, although some components have been replaced over the last century. The circuit court found, however, that "[s]ince 1976, the state has killed just seven men in the electric chair." This diminished use of electrocution arose after lethal injection became available in the United States, as the latter was universally perceived to be a more humane execution method, and inmates exercised their right to decline the electric chair as their means of execution. South Carolina inherently recognized this point itself nearly three decades ago, when the legislature amended section 24-3-530 in 1995 to adopt lethal injection and designated it as the default method of execution in this state. *See* Act No. 108, 1995 S.C. Acts 695–96. At that time, the legislature relegated electrocution to an alternative that was available only when specifically and timely elected by a prisoner or in the event lethal injection was deemed unconstitutional. *Id.*

The disfavored status of the electric chair is also borne out nationally. Although electrocution was once the predominant (or only) method of execution in most states that had the death penalty, according to the Death Penalty Information Center, which tracks legislation in all fifty states, South Carolina was one of only eight states remaining nationwide that still allowed electrocution at the time the circuit court heard this matter. *See Methods of Execution*, Death Penalty Information Center, https://deathpenaltyinfo.org/executions/methods-of-execution (listing Alabama, Arkansas, Florida, Kentucky, Mississippi, Oklahoma, South Carolina, and Tennessee as the only states having electrocution as a method of execution at that time) (last visited June 6, 2024). Thus, statistically, the electric chair is a relic from another century whose use is confined predominantly to a small contingent of southern states.

It is also notable that South Carolina is the only state in which electrocution is now the primary method of imposing the death penalty; the other states that allow

electrocution have expressly moved to lethal injection as their primary means of execution and permit electrocution only as an alternative option. *Id.* The Supreme Court of Georgia and the Supreme Court of Nebraska ruled in 2001 and 2008, respectively, that the use of the electric chair violated their state constitutional prohibitions against cruel and unusual punishment. *Id.* Virginia had authorized the electric chair as an option in some cases, but Virginia repealed the death penalty in its entirety in 2021. *Id.*

The circuit court noted that only three states had ever addressed the constitutionality of electrocution as a method of execution, Florida (1999),[31] Georgia (2001), and Nebraska (2008), and it emphasized that Georgia and Nebraska have each held that electrocution violates their state prohibitions on cruel and unusual punishment. *See Dawson v. State*, 554 S.E.2d 137 (Ga. 2001); *State v. Mata*, 745 N.W.2d 229 (Neb. 2008).

To reiterate, I agree with the State that rarity alone is not a sufficient ground to find an execution method is unusual. As with the firing squad, however, electrocution is a method that has been available for over a century and, despite the fact that it is otherwise readily available, it has evolved into a disfavored method of execution in most all jurisdictions, as more information has become known about the true extent of the extensive physical damage and mutilation that occurs during electrocution, such as prisoners being engulfed in flames, suffering extensive burns, and bleeding prior to death. Just as burning at the stake or other means of setting a prisoner on fire are no longer considered usual or acceptable punishment, I believe it is not an unreasonable extrapolation to determine that setting alight a prisoner in this manner now carries a similar disfavored status. The only difference, in my view,

---

[31] In *Provenzano v. Moore*, 744 So. 2d 413 (Fla. 1999), the Florida Supreme Court found no constitutional violation, but after the United States Supreme Court issued a writ of certiorari, the Florida legislature amended Florida law to make lethal injection the default method of execution. Thereafter, the Supreme Court dismissed the writ. *See Bryan v. Moore*, 528 U.S. 1133, 1133 (2000) (dismissing the writ "[i]n light of the representation by the State of Florida, through its Attorney General, that petitioner's 'death sentence will be carried out by lethal injection, unless petitioner affirmatively elects death by electrocution,' pursuant to the recent amendments to Section 922.10 of the Florida Statutes"). The circuit court in the current matter concluded the import of *Provenzano* is that "the decision of the Florida Supreme Court was effectively abrogated when the Florida legislature amended that state's methods of execution statute to remove the possibility of an involuntary execution by electrocution."

is the "modernization" in the last century of the means of ignition—from a match to electric current.  The end result of the process, for all intents and purposes, remains the same.

The majority opinion concedes the use of electrocution has become a rarity.  However, it opines electrocution is not an "unusual" punishment because it has not been disfavored or rejected by our citizens.  Rather, the majority opinion suggests it is disfavored only by prisoners, who are choosing lethal injection over electrocution as a method of execution.  For the reasons I outlined previously in my discussion of the firing squad, I disagree with the framework used by the majority for its decision, as this Court necessarily must look both within and beyond the borders of this particular jurisdiction to ascertain whether a punishment is unusual.  Further, the suggestion that electrocution is disfavored only by a small number of individuals—prisoners who are on death row—rings hollow in light of widespread reports to the contrary on this subject.  *See, e.g.*, *Mata*, 745 N.W.2d at 286 (Heavican, C.J., concurring in part and dissenting in part) ("It is true that electrocution has fallen into disfavor among American jurisdictions.").

A large majority of the states that allow the death penalty at all either no longer allow electrocution, or allow it only as an alternative means of execution.  This fact reflects a consensus on the reduced desirability of electrocution by numerous jurisdictions, and this societal view exists regardless of the preferences of a small subset of prisoners, i.e., those currently on death row.  With South Carolina now being the sole state to establish the disfavored method of electrocution as its primary means of execution, I do not believe the circuit court erred in concluding electrocution has become an unusual punishment.[32]

---

[32] I note electrocution is purely an American invention.  Despite its prevalence in this country in the last century, electrocution was never widely implemented in any other country except the Philippines (where it was introduced by the United States during a period of colonial government).  The Philippines has since abolished the use of electrocution.  *See generally Electrocution*, Britannica (online), https://www.britannica.com/topic/electrocution (indicating the use of electrocution ended in the Philippines in 1976).  While it ended capital punishment for a period and then utilized the firing squad, the Philippines later adopted lethal injection as the sole method of execution.  *See* An Act Designating Death by Lethal Injection as the Method of Carrying Out Capital Punishment, Amending for the Purpose Article 81 of the Revised Penal Code, as Amended by Section 24 of Republic Act No. 7659, Rep. Act No. 8177 (Mar. 20, 1996) (Phil.).

Although I agree with the majority that the legislature is the entity concerned with public policy and the establishment of crimes and criminal punishment, all criminal punishment is subject to the prohibition in the South Carolina Constitution against unusual (or cruel or corporal) punishment, and whether such punishment violates our state constitution presents a question of law for this Court. *See generally People v. Garcia*, 213 Cal. Rptr. 3d 217, 224 (Ct. App. 2017) ("Although it is the Legislature's role to define crimes and proscribe penalties for them, all statutory penalties are subject to the constitutional prohibition against cruel or unusual punishments contained in article I, section 17 of the California Constitution."); *id.* at 225 (stating whether a punishment is cruel or unusual in violation of the state constitution "presents a question of law subject to independent review" (citation omitted)).

I note that one of the State's representatives submitted a supplemental filing advising this Court that, after oral arguments were held in this appeal, Louisiana reintroduced electrocution as an authorized method of execution in that state. *See* Act No. 5, 2024 La. Acts ____, H.B. 6, Second Extra. Sess. (La. 2024), https://www.legis.la.gov/legis/BillInfo.aspx?s=242ES&b=HB6&sbi=y (reintroducing electrocution and adding nitrogen gas hypoxia as methods of execution, to be used along with the existing method of lethal injection, effective July 1, 2024). The State contends "the fact that another [s]tate has added electrocution to its list of authorized methods confirms that electrocution is not an unusual method of execution." I disagree that a small contingent of outliers from among fifty jurisdictions establishes any kind of trend that compels this Court to reject the circuit court's findings and conclude electrocution has once again become a "usual" form of punishment. Consequently, I agree with the circuit court that electrocution has become an unusual punishment in the United States and dissent from the majority opinion on this point.

### III. Ban on Cruel Punishment

The State also challenges the circuit court's determination that the firing squad and electrocution violate South Carolina's constitutional ban on cruel punishment. I agree with the circuit court's conclusion and, therefore, dissent from the conclusion of the majority opinion in this regard.

### A. Firing Squad

The circuit court found "[t]he use of a firing squad to accomplish death is cruel." The court cited a prominent decision of the United States Supreme Court, *In*

*re Kemmler*, which in 1890 articulated the following definition of "cruel" in this context: "Punishments are cruel when they involve torture or a lingering death . . . . It implies there [is] something inhuman and barbarous,—something more than the mere extinguishment of life." *In re Kemmler*, 136 U.S. 436, 447 (1890).

Various iterations of this standard have been applied in both state and federal courts since that time. For example, in finding electrocution was unconstitutional in 2001, the Supreme Court of Georgia cited the standard in *Kemmler* for considering cruel (and unusual) punishment, but further explained that the focus under its state constitution and, thus, under Georgia's standard, would not be limited to only the unnecessary conscious pain suffered by the prisoner because the evidence established that, as a practical matter, "it is not possible to determine conclusively whether unnecessary pain is inflicted in the execution of the death sentence." *Dawson*, 554 S.E.2d at 142–43.

The Georgia court stated, "Such a limited focus would lead to the abhorrent situation where a condemned prisoner could be burned at the stake or crucified as long as he or she were rendered incapable by medication of consciously experiencing the pain, even though such punishments have long been recognized as 'manifestly cruel and unusual.'" *Id.* at 143 (quoting *In re Kemmler,* 136 U.S. at 446). Rather, the Georgia court reasoned it was also the unnecessary mutilation and disfigurement of a prisoner and the unusualness of the mutilation in light of other alternatives that rendered a particular method manifestly cruel and unusual. *See id.* ("We cannot ignore the cruelty inherent in punishments that unnecessarily mutilate or disfigure the condemned prisoner's body or the unusualness that mutilation creates in light of viable alternatives which minimize or eliminate the pain and/or mutilation.").

The evidence before the circuit court in the current appeal included SCDC's newly created protocols for the establishment of the firing squad, as it had never been a method of execution in this state. The protocols provide the prisoner shall be hooded and strapped to a backless metal chair, with an "aiming point" placed over the heart. A three-member team, armed with rifles containing .308 Winchester 110-grain TAP urban ammunition will be stationed fifteen feet away and will fire at the prisoner's chest when directed, and the prisoner's vital signs will be checked by a physician every sixty seconds until death is pronounced. If vital signs continue after ten minutes, the firing squad will fire a second volley, and contingency protocols provide for a third volley if the prisoner continues to exhibit signs of life.

Autopsy photographs from the last execution by firing squad in Utah were submitted for illustration of the procedure, as Utah is the only state that has used the

firing squad in the nearly fifty years since the resumption of the death penalty in the United States following the decision in *Gregg v. Georgia*, 428 U.S. 153 (1976). *See generally Facts About the Death Penalty*, Death Penalty Information Center, https://dpic-cdn.org/production/documents/pdf/FactSheet.pdf (last visited June 6, 2024) (indicating only three executions by firing squad have occurred in the United States since 1976, all of which occurred in Utah). The autopsy photographs depict multiple entrance wounds in the prisoner's chest and extensive areas of blood on his body and clothing.

Several witnesses testified about the conscious pain and mutilation that can occur during execution by firing squad. Colie Rushton, the Director of Security and Emergency Operations at SCDC, who developed the protocols for the firing squad, testified that he intentionally chose ammunition that breaks apart upon impact because it would inflict the most damage to a prisoner's body. The ammunition was expected to cause cavitation (a hole) in the prisoner's chest up to six inches in diameter. SCDC's protocols allowing the firing of up to three rounds of ammunition can compound the physical damage.

Dr. Jonathan Arden, who was qualified as an expert in forensic pathology, provided information about the injuries caused by the firing squad and electrocution. As to the firing squad, Dr. Arden testified that a prisoner usually does not immediately lose consciousness upon being shot and, even if the heart function was completely disrupted upon the shooting because the ammunition was perfectly aligned with the target, the prisoner would be able to feel pain for up to fifteen seconds. He testified the prisoner would remain sensate for longer than this time, however, under any other scenario that resulted in less than a complete disruption of the heart function or the fragmentation of the bullet into other, surrounding areas of the chest.

Dr. Jorge Alvarez was qualified as an expert in cardiology and agreed that the precise location of the impact from the shooting would determine how long a prisoner remained conscious. While he differed somewhat from Dr. Arden, as he believed consciousness could be less than ten seconds if the shot was placed precisely and exsanguination occurred more rapidly, he acknowledged that the precise location where the bullet strikes the prisoner would impact the time of death. Dr. Alvarez agreed with other witnesses that with the firing squad, death is caused by the disruption of the heart and surrounding vessels, that the heart is located behind multiple bones, including the ribs and the sternum, the sternum covers up to one-half of the heart, and the resulting physical injuries of broken bones and chest

cavitation would cause pain to the prisoner. Notably, he agreed with Dr. Arden that the loss of consciousness is not immediate with the use of a firing squad.

The circuit court found extensive mutilation occurs during a shooting by firing squad. The court stated "it is clear that the firing squad causes death by damaging the inmate's chest, including the heart and surrounding bone and tissue." The court added, "This is extremely painful unless the inmate is unconscious which, according to Drs. Arden and Alvarez, is unlikely." The court found an inmate is likely to be conscious for a period of time, at the least a minimum of ten seconds, but this could be extended if the initial round of ammunition does not fully incapacitate the heart. The court found that, during this time, the inmate would feel pain from the resulting gunshot wounds and the broken bones caused by the impact of the frangible ammunition. The court further found the pain would be exacerbated by any movement by the prisoner, such as flinching or breathing. The circuit court concluded, "This constitutes torture, possibly a lingering death, and pain beyond that necessary for the mere extinguishment of [life], making the punishment cruel."

In my view, the evidence supports the circuit court's determination that the firing squad constitutes cruel punishment. While the State argues extensively about the length of time it takes to die by firing squad and how long the inmate may consciously experience pain and suffering, this is not the only relevant consideration in determining whether a punishment is cruel. As has been noted by other jurisdictions, it is not possible to know with absolute precision how long a prisoner will be conscious and suffer pain, and the level of that pain. The time of conscious pain can vary, whether or not the method is carried out properly—i.e., there can be excessive pain even in the absence of a "botched" execution. *See generally Dawson*, 554 S.E.2d at 143.

In reversing the circuit court's determination, the majority focuses on the definition of cruel as causing unnecessary and excessive pain and disregards any element of mutilation or disfigurement. Armed with this narrow view of the execution process, it unflinchingly asserts that its "definition of cruel does not call upon us to analyze what the death chamber looks like after the execution has been carried out." While denying its relevance, however, the majority acknowledges the "physical violence to the body" that occurs during this method of execution: "There is no consideration in our analysis of whether a method of execution is 'cruel' of the dramatic imagery set forth in the circuit court's order or the [I]nmates' brief, such as blood spattered on the walls and pooling on the floor, or other *physical violence to the body* that occurs simultaneous with or subsequent to the cessation of pain." (Emphasis added.)

I agree with the Georgia court's observation that excessive and unnecessary mutilation of a prisoner is directly relevant to the consideration whether punishment is cruel.  Importantly, this is not a unique view.  Rather, it accords with this Court's own precedent, as we have specifically held that mutilation of a prisoner constitutes cruel and unusual punishment in violation of article I, section 15 of the South Carolina Constitution.  *See State v. Brown*, 284 S.C. 407, 326 S.E.2d 410 (1985) (holding mutilation as punishment for a criminal offense violates article I, section 15 of the South Carolina Constitution).

By averting its eyes from the objective evidence of the firing squad's brutality—the extensive mutilation of the prisoner—the majority also overlooks the unnecessary and extensive pain that is inflicted by this method of execution.  The two are inherently intertwined and have no temporal separation, as suggested by the majority.  The unnecessary pain and the mutilation of the prisoner are also evidenced by the admitted aim of SCDC to use ammunition that inflicts the maximum physical damage to the prisoner, and by the bloodied state of the execution room.  As is further detailed in my discussion of corporal punishment, South Carolina's protocols for the firing squad include the positioning of a tray under the prisoner for the collection of blood, as the process of the firing squad involves the "bleeding out" of the condemned, along with a background "splatter wall" to protect the room where the prisoner is executed.  The state of the execution room corroborates the physical mutilation that occurs, and this mutilation occurs while the prisoner is still alive.  As a result, the mutilation and, as the circuit court described it, "carnage," are both highly relevant to the analysis of cruel punishment.

As for the element of pain, I believe the majority also misapprehends the timeframe testified to of when conscious pain occurs.  It highlights expert estimates of ten and fifteen seconds, but ignores the balance of their testimony that this would be the absolute minimum time of consciousness under ideal circumstances where the target is absolutely accurate.  The experts stated the time would be longer in the absence of great accuracy.  Less than perfect accuracy is anticipated by the firing squad's protocols themselves, however, as they establish that execution by firing squad is a process that can extend over ten minutes if the initial volley is insufficient to cause death.  Because, as other jurisdictions have indicated, conscious pain is not easily quantified, I believe the majority should have recognized the excessive mutilation that occurs simultaneous with the shooting and its inherent infliction of pain upon the prisoner.

In my view, the circuit court did not err in finding the firing squad causes pain beyond that necessary for the mere extinguishment of life and mutilation of the

prisoner. Accordingly, I dissent from the majority's holding, as I believe the firing squad qualifies as cruel punishment under state law.

## B. Electrocution

The circuit court similarly concluded electrocution as a method of execution constitutes cruel punishment under our state constitution. In challenging the circuit court's determination, the State asserts an "originalist" understanding of "cruel" should be used, i.e., cruel refers to something that constitutes torture or is beyond just what is needed to cause death, and they maintain the United States Supreme Court previously upheld the constitutionality of the electric chair over a hundred years ago, in *In re Kemmler*, 136 U.S. 436 (1890), and again in later decisions, and it has been upheld by this Court. The State also asserts criminals are not guaranteed pain-free deaths or even the least-painful method of death.

The State maintains "cruel" punishments are those that "intensify" the sentence of death, citing *Bucklew v. Precythe*, 587 U.S. 119 (2019). It asserts burning at the stake, public display of a corpse, and dismemberment are examples of conduct that could "intensify" an execution and that could, therefore, constitute "cruel" punishment, and it denies that what transpires to a prisoner during electrocution can be something that "intensifies" the imposition of a death sentence. The State further argues that the framers and ratifiers of article I, section 15 of the South Carolina Constitution did not understand electrocution to be unconstitutional, so it should not be deemed so by this Court.

In reversing the circuit court, the majority cites the presumption of the constitutionality of a statute and indicates our standard of review requires what appears to be a heightened deference to the legislature's findings and the framers' contemporaneous knowledge, at the time of the latest revision of the constitution, that electrocution was an existing punishment in this state.

I agree that this Court must respect the doctrine of the separation of powers, and it does so here today. While the framers' views, when ascertainable, are certainly relevant on legislative matters, their past understanding of the constitutionality of a particular provision is not conclusive. If it were, this would itself violate the separation of powers, as the legislative branch of government would be assuming the role of the judicial branch, which is to interpret the law and to declare whether a challenged provision is constitutional. *See generally Weems v. United States,* 217 U.S. 349, 379 (1910) (stating the legislature has the authority to prescribe punishments, which "have no limitation . . . but constitutional ones, and what those

are the judiciary must judge"); *Dawson v. State*, 554 S.E.2d 137, 139 (Ga. 2001) ("That presumption of constitutionality, however, cannot prevail when a statute manifestly infringes upon a constitutional provision or violates the rights of the people. Thus, the mere fact that the Legislature has spoken on the issue of the method of execution does not preclude or limit this Court's evaluation of the selected method to determine whether it comports with the constitutional prohibition against cruel and unusual punishment."); *State v. Mata*, 745 N.W.2d 229, 267 (Neb. 2008) (stating while statutes are presumed to be constitutional, "presumptions can be overcome, and the Legislature cannot establish a method of execution that offends the constitutional guarantee against cruel and unusual punishment").

Moreover, the legislature's inclusion of an express prohibition against cruel punishment in our state constitution evinces its understanding that a legislature's authority to establish both criminal offenses and their punishments is subject to a constitutional limit to prevent the abuse of this great power. This was also the motivation for our nation's founders to include the Eighth Amendment's ban on cruel and unusual punishment to protect citizens from the possibility that an unchecked power to punish could devolve into tyranny. It is these self-imposed limits on power that distinguish our form of government from the authoritarian rule of monarchies and dictators. Thus, in fulfilling the judiciary's role of review, we are actually acting in conformity with, not contrary to, the original governmental design of this state and the United States. *Cf. Weems*, 217 U.S. at 372–73 ("With power in a legislature great, if not unlimited, to give criminal character to the actions of men, with power unlimited to fix terms of imprisonment with what accompaniments they might, what more potent instrument of cruelty could be put into the hands of power? And it was believed that power might be tempted to cruelty. This was the motive of the clause [in the Eighth Amendment prohibiting cruel and unusual punishment] . . . .").

As for the impact of *In re Kemmler* on the question whether electrocution is unconstitutionally cruel under our state law, I note the majority states *In re Kemmler* is a "foundation" for the meaning of "cruel," as supplemented by a series of Supreme Court decisions, including *Bucklew*, but it ultimately applies what could be considered the foundational definition and asserts a prisoner must prove there is a substantial risk that the State's use of the challenged method of execution will inflict unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a capital sentence. Notably, although *In re Kemmler* has been viewed as support for the validity of electrocution as a method of execution, the majority states it does not rely on this case as precedent on the merits of this question.

I agree with the majority to the extent it defines cruel punishment as causing unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a capital sentence, but I would also add to this definition South Carolina's precedent holding that the mutilation of a prisoner also constitutes cruel (and unusual) punishment in violation of article I, section 15 of our state constitution, as expressly stated in *State v. Brown*, 284 S.C. 407, 326 S.E.2d 410 (1985). The United States Supreme Court has itself noted that its definition of cruel and unusual in *Kemmler* was not exhaustive, and it has recognized that "bodily pain or mutilation" qualify as cruel punishment. *See Weems*, 217 U.S. at 370–71 ("The case [*In re Kemmler*] was an application for habeas corpus, and went off on a question of jurisdiction, this court holding that the 8th Amendment did not apply to state legislation. It was not meant . . . to give a comprehensive definition of cruel and unusual punishment, but only to explain the application of the provision to the punishment of death."); *id.* at 372 (noting the addition of the prohibition on cruel and unusual punishment at the time of the nation's founding was because "it must have come to them that there could be exercises of cruelty by laws other than those which *inflicted bodily pain or mutilation*" (emphasis added)).

On the merits of the constitutionality of electrocution under South Carolina law, I fully agree with the majority that *In re Kemmler* is not controlling. My position is based not just on the age of the decision (the 19th century) on such a changeable subject as the death penalty, but also the manner in which *Kemmler* was decided and the way cases thereafter summarily cited *Kemmler* without ever revisiting the faulty legal foundation upon which it was premised.

The *Kemmler* case arose in New York, which was the first state to implement electrocution as an execution method to replace what was considered the more "barbaric" method of hanging. The change came after New York's Governor presented the following message to the New York legislature in 1885:

> The present mode of executing criminals by hanging has come down to us from the dark ages, and it may well be questioned whether the science of the present day cannot provide a means for taking the life of such as are condemned to die in a less barbarous manner. I commend this suggestion to the consideration of the legislature.

*In re Kemmler*, 136 U.S. at 444.

The result of the Governor's plea was the creation of a three-member commission comprised of a dentist and two attorneys, which ultimately recommended that New York adopt electrocution. *See* Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551, 567–73 (1994) (exploring how electrocution became a method of execution in the United States after its adoption in New York in the late 1800s and the legal flaws underpinning the decision in *Kemmler*). The author of this historical background on electrocution and the *Kemmler* decision highlights the battling commercial interests and professional reputations that permeated the commission's decision to recommend electrocution over other methods and the lack of any scientific knowledge about the effects of electrocution on the human body at the time of its adoption. *Id.* at 567–68.

One of the commission's members observed a man die from an accidental electrocution and then conducted multiple experiments on animals, and he brought this information into the decision-making process to consider what should replace hanging. *Id.* at 569–70. Medical professionals opposed the use of medicines/poisons to cause death, which influenced the commission to abandon its consideration of lethal injection as a viable option for capital punishment. *Id.* at 572–73. New York ultimately accepted the commission's recommendation and adopted electrocution in 1888 to replace hanging. *Id.* at 573. William Kemmler, who was convicted in 1889 of the murder of his girlfriend, was the first defendant to face electrocution and repeatedly challenged it based on state and federal constitutional grounds. *Id.* at 577–78.

Notably, in seeking to challenge the imposition of electrocution, Kemmler was required to prove New York's law was unconstitutional beyond a reasonable doubt, whereas modern jurisprudence would impose a lesser burden of proof. *Id.* at 597. Further, the hearing held in the matter relied in large part upon the testimony of Thomas Edison, who was not in favor of the death penalty, but agreed to testify and state that the use of alternating current (AC) electricity—such as was produced by his business competitor, George Westinghouse—was so lethal that it would produce "instantaneous death," whereas the direct current (DC) electricity that he promoted was "safe" for community use. *See id.* at 571. Edison also subsidized experiments on animals to show the danger and death that could result from using his competitor's AC electricity. *See id.* at 574–75. Thus, the reliance on a witness like Edison, who had a strong economic interest in the outcome of the case, has led to questions about the reliability of the result. In addition, the only evidence elicited in the hearing focused on experiments that had been conducted on animals. There

was no scientific evidence presented regarding the adverse effects of electricity on the human body. *See id.* at 571–84.

Westinghouse, whose business was impacted by the perception that his AC electrical service was lethal enough to be used for the electric chair, reportedly helped pay for Kemmler's appeals that went up to the Supreme Court, where Kemmler ultimately lost his challenge to electrocution in 1890. *Id.* at 578. Kemmler was electrocuted and, according to contemporary news reports from execution witnesses, the electrocution of Kemmler, the first ever in the United States, was itself a "botched" execution, as Kemmler caught on fire and his body was charred, leaving the witnesses distraught, with some fleeing the room due to the smoke and odor. *Id.* at 600–04. Those present reported Kemmler was "slowly roasted to death," he was "burned and shocked," and he suffered a "death by torture." *Id.* at 603. Westinghouse responded, "They could have done better with an ax." *Id.* at 603–04. Then, as now (in the evidence submitted in the current appeal), reports indicated that the skull is not a good conductor of electricity and that it is not easy to predict how the human body will react to electricity, as it is highly variable.

For years, however, courts have cited *Kemmler* as approving the use of electrocution without revisiting the tenuous foundation for the Supreme Court's decision or how the New York courts came to uphold New York's use of electrocution as a method of execution in the first instance. New York reportedly adopted the electric chair in no small measure based on the strength of Thomas Edison's popularity, as he was regarded as a national hero for his inventions. Edison helped promote the use of Westinghouse's "lethal" AC electricity to protect his own competing commercial interests, despite his initial reluctance due to his personal opposition to the death penalty. Thereafter, the Supreme Court again upheld electrocution in an early case from 1915 citing *Kemmler* that arose out of South Carolina, without revisiting the continued efficacy of *Kemmler* or examining the effects of electrocution on human beings. *See Malloy v. South Carolina*, 237 U.S. 180 (1915).

Some six decades later, this Court held in a 1979 case that death by electrocution does not constitute cruel and unusual punishment, apparently analyzing the question under the Eighth Amendment. Despite the significant passage of time since the Supreme Court's 1890 "analysis" of electrocution as an execution method in *Kemmler*, the Court summarily stated, in relevant part:

> The argument that the use of electrocution as a means of
> inflicting the death penalty constitutes cruel and unusual

punishment has been decided adversely to appellants by the United States Supreme Court in *In re Kemmler*, [136 U.S. 436] (1890).

*State v. Shaw*, 273 S.C. 194, 206, 255 S.E.2d 799, 805 (1979), *overruled by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (abolishing the doctrine of *in favorem vitae* review for capital defendants).

Thereafter, in *Glass v. Louisiana*, 471 U.S. 1080 (1985), Justice Brennen, joined by Justice Marshall, dissented from the Supreme Court's refusal to grant a petition for a writ of certiorari to review a decision challenging electrocution as a method of execution. They criticized the Supreme Court's continued refusal to accept a case that would re-examine *Kemmler*, despite its legal shortcomings and the obvious fact that evolving standards of decency might well dictate a different result a century later.

In light of the foregoing, and in accordance with the principle that evolving standards of decency should guide our view of punishment as science and knowledge improve, I believe this Court should reexamine the propriety of electrocution under South Carolina law. In my opinion, the circuit court did not err in concluding electrocution as a means of imposing the death penalty violates the ban on cruel punishment in our state constitution.

As was the case at the time of *Kemmler*, the experts at the trial of the current matter have confirmed that the effects of electricity upon the human body cannot be predicted with certainty. In addition, experience over the last century has now shown, both in the example of Kemmler himself and with the other prisoners who came after him, that electrocution often results in the prisoner catching on fire and becoming charred during the execution process. The experts in this case have indicated that the body of the prisoner actually heats up and "cooks" during electrocution, resulting in gross disfigurement and mutilation. The executioners cannot even touch a body immediately following electrocution due to the extreme heat generated. The heat typically results in melting the prisoner's flesh, which must be scraped from the electric chair after its use. This information was not known at the time the *Kemmler* case wound through the courts, but it became known when he became the first to experience smoke and charring, based on contemporaneous reports from the eyewitnesses.

The blind reliance on *Kemmler* has now been discounted, however, by multiple members of the Supreme Court, and several jurisdictions that have

specifically reconsidered the propriety of electrocution and have now rejected it as unconstitutional punishment under their state law. They reasoned that, while "unnecessary pain" is something that is difficult, if not impossible, to know with any degree of certainty, excessive and unnecessary mutilation of the prisoner, including the setting on fire of the prisoner, is an objective fact. Moreover, the extensive mutilation occurring during the procedure is inherently capable of being accompanied by excessive pain.

For example, in *Dawson v. State*, 554 S.E.2d 137 (Ga. 2001), referenced previously, the Supreme Court of Georgia observed that it is impossible to conclusively determine whether "unnecessary pain" is inflicted upon a prisoner during an execution, but it asserted its focus under state law "is not limited to the issue of the unnecessary conscious pain suffered by the condemned prisoner." *Id.* at 142–43.

The *Dawson* Court provides a reasonable response to the majority's observation here that prisoners are not guaranteed the least-painful method of execution. The *Dawson* Court stated the fact that there is a method with less pain and mutilation that many states have moved to is an "important factor" in analyzing whether an older method constitutes cruel and unusual punishment:

> We cannot ignore the cruelty inherent in punishments that unnecessarily mutilate or disfigure the condemned prisoner's body or the unusualness that mutilation creates in light of viable alternatives which minimize or eliminate the pain and/or mutilation. Although the Fourth Circuit Court of Appeals has posited that the "existence and adoption of more humane methods [of execution] does not *automatically* render a contested method cruel and unusual," (emphasis supplied), *Hunt v. Nuth,* 57 F.3d 1327, 1338 (4th Cir. 1995), the fact that a method involving less pain and mutilation exists and that many states have moved to that method because it is perceived to be a more humane manner of execution, id. at 1338, fn. 16, clearly must play an important factor in the determination whether an older method is cruel and unusual punishment.

*Id.* at 143 (alteration in original).[33]  The *Dawson* Court also noted that mutilation occurs even when electrocution is "correctly" performed according to protocols:

> [T]he bodies of condemned prisoners in Georgia are mutilated during the electrocution process.  This applies whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly.  The autopsy reports show that the bodies are burned and blistered with frequent skin slippage from the process, and the State's experts concur that the brains of the condemned prisoners are destroyed in a process that cooks them at temperatures between 135 and 145 degrees Fahrenheit.  This evidence . . . establishes the mutilating effects of electrocution.

*Id.* (footnote omitted).

The *Dawson* Court concluded that such punishment causing excessive pain and mutilation violated its state ban on cruel and unusual punishment: "Accordingly, we hold that death by electrocution, with its specter of excruciating pain and its certainty of cooked brains and blistered bodies, violates the prohibition against cruel and unusual punishment in Art. I, Sec. I, Par. XVII of the Georgia Constitution." *Id.* at 144.

A few years later, in *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008), the Supreme Court of Nebraska also had the occasion to revisit electrocution and found it to be cruel and unusual punishment, as death is not instant as was originally

---

[33] Over twenty years ago, a Connecticut court observed that lethal injection was then believed to be the method least likely to cause unnecessary pain.  *See, e.g.*, *State v. Webb*, 750 A.2d 448, 457 (Conn. 2000) ("Of the thirty-eight states permitting capital punishment, at least thirty-four have adopted lethal injection as a manner of execution.  They have done so because it is *universally recognized as the most humane method of execution, least apt to cause unnecessary pain.*" (emphasis added) (footnote omitted)).  In 2008, the United States Supreme Court observed, in *Baze v. Rees*, 553 U.S. 35, 62 (2008), that lethal injection was "believed to be the most humane [execution method] available."  While the State argues a state need not use a less painful method of execution, as a pain-free death is not guaranteed, I disagree that a state may ignore clear indications that a particular method of execution results in excessive pain and mutilation.

believed in the 19th century, and it results in the setting alight and charring of prisoners in a manner that is not compatible with evolving standards of decency. The *Mata* Court rejected the argument from the state as to how many seconds the prisoner would consciously feel pain while being electrocuted, the court stating even fifteen to thirty seconds is not "a permissible length of time to inflict gruesome pain" on a prisoner "when a human being is electrically on fire." *Id.* The *Mata* Court stated, "It is akin to arguing that burning a prisoner at the stake would be acceptable if we could be assured that smoke inhalation would render him unconscious within 15 to 30 seconds." *Id.*

The *Mata* Court emphasized that experts frequently cannot quantify the pain from a particular execution method, so it can never be proven with certainty. *See id.* at 261–62 ("A method of execution violates the prohibition against cruel and unusual punishment if there is a substantial foreseeable risk, inherent in the method, that a prisoner will suffer unnecessary pain. Prisoners are not required to show that their execution will actually result in unnecessary pain. The human body does not respond uniformly to electric current. And, obviously, there are no first-person accounts of an execution that a court can consult. So, courts must necessarily deal with probabilities." (footnotes omitted)).

The *Mata* Court found that, in addition to creating a substantial risk of unnecessary pain, electrocution is cruel because of its "infliction of physical violence and mutilation of the prisoner's body" that is inconsistent with the evolving standards of decency:

> Besides presenting a substantial risk of unnecessary pain, we conclude that electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation of the prisoner's body. *Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man.* Other states have recognized that early assumptions about an instantaneous and painless death were simply incorrect and that there are more humane methods of carrying out the death penalty.

*Id.* at 278 (emphasis added).

The *Mata* Court concluded electrocution violated the state constitutional prohibition against cruel and unusual punishment, stating it has become a "dinosaur"

in the United States:  "Examined under modern scientific knowledge, 'electrocution has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of state prisons.'"  *Id.* (citation omitted).  The circuit court in the current appeal cited *Mata* and found it to be particularly relevant and persuasive, noting that two of the experts who testified in *Mata*, Dr. Ronald Keith Wright and Dr. John Peter Wikswo, also testified in the current matter (for the State and Inmates, respectively) and offered essentially the same opinions about the effects of electrocution on the human body.

The reality of electrocution is that it does not provide the clean and instant death that Thomas Edison promoted in the late 1800s based on the experiments on animals.  That assumption was wrong then and it remains wrong now, as indicated by the studies that are now available on the impact of electrocution on the human body over the last century.  Although the State attempts to discredit this evidence, the gross disfigurement and the heating aspects of electrocution that were presented to the circuit court by expert witnesses are indisputable and have been accepted in several other jurisdictions that have considered the matter.[34]

The State acknowledges that burning prisoners at the stake or other methods of setting individuals on fire would not be allowed today because burning would constitute unconstitutionally cruel punishment.  In my view, electrocution, which experts have stated routinely results in flames and plumes of smoke, the charring of the prisoner, and other evidence of burning, is essentially another form of setting prisoners on fire.  As one expert stated, electrocution is, simply put, a heating up and cooking of human flesh.  This has been true since the first electrocution of the prisoner in *Kemmler*.  The one thing that perhaps remains viable from *Kemmler* is its statement as to cruel and unusual punishment:

> Punishments are cruel when they involve torture or a lingering death . . . .  It implies [] something inhuman and barbarous,—something    more    than    the    mere extinguishment of life.

*In re Kemmler*, 136 U.S. at 447.  As noted above, I would add to this definition that South Carolina recognizes that mutilation constitutes cruel and unusual punishment.

---

[34] It does not take an expert to understand this point.  The fact that burning of the prisoner and smoke are commonly understood to be the by-products of electrocution is evident in the colloquial nicknames used for the electric chair, such as "Old Sparky" and "Old Smokey."

In my opinion, this Court should follow the examples of Georgia and Nebraska, which have declared electrocution constitutes cruel punishment because it creates a substantial risk of excessive pain and mutilation. Although the majority rejects the thoughtful analysis of those jurisdictions, I see no compelling basis for their distinction.

Lastly, I note that electrocution not only causes extreme pain and mutilation to the prisoner, but it also presents risks, both mentally and physically, to those who must assist in this procedure. *See* Chiara Eisner, *They Executed People for the State of South Carolina. For Some, it Nearly Destroyed Them*, The State (updated Jan. 4, 2022), https://www.thestate.com/news/local/crime/article254201328.html. This also supports my determination that the effects on the prisoner from electrocution, including burning, melting, charring, disfigurement, and mutilation, are objectively and readily discernible and well beyond that which is necessary to carry out a capital sentence.

For all of the foregoing reasons, I dissent from the majority's reversal of the circuit court's determination that electrocution constitutes cruel punishment in violation of the South Carolina Constitution. Questions about electrocution have existed since its inception, but any doubts have been repeatedly and summarily brushed aside based on the misguided reliance placed on one habeas corpus case from the 19th century, *In re Kemmler*. In my view, this Court should join the jurisdictions of Georgia and Nebraska in recognizing electrocution is an unconstitutionally cruel punishment. It is undoubtedly an inhumane relic from another century, along with burning at the stake and other forms of incendiary punishment that are incompatible with the evolving standards of decency.

## IV. Ban on Corporal Punishment

The State next challenges the circuit court's determination that the firing squad and electrocution are unconstitutional because they violate the state's prohibition on "corporal" punishment. I agree with the circuit court's ruling and, therefore, dissent from the majority opinion in this regard.

The circuit court defined "corporal" as "pertaining or relating to the body," citing Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/corporal (last updated May 16, 2024) (defining corporal to mean "of, relating to, or affecting the body"). The circuit court stated that, "[f]or purposes of interpreting the South Carolina Constitution, 'corporal' also refers to mutilation of the human body," citing this Court's decision in *State v. Brown*, 284

S.C. 407, 411, 326 S.E.2d 410, 412 (1985) (holding castration is a form of mutilation and that mutilation as punishment for a criminal offense is prohibited by article I, section 15 of the South Carolina Constitution).

In support of its determination, the circuit court outlined expert testimony from Colie Rushton, the Director of Security and Emergency Operations at SCDC. Rushton testified that, in developing South Carolina's protocols for the firing squad, he intentionally chose frangible ammunition because it would inflict maximal damage to a prisoner's body upon impact. The circuit court noted Rushton stated he opted for specific ammunition that he understood would cause cavitation in the prisoner's chest up to six inches in diameter. The circuit court stated that the protocols called for up to three such rounds of ammunition, compounding the physical damage to a prisoner's body.

The circuit court indicated extensive damage was also confirmed by autopsy photographs of the last execution by firing squad conducted in Utah, which were submitted as exhibits in this matter. The photographs depict multiple entrance wounds in the individual's chest and a large volume of blood on his body and clothing. The circuit court stated, "The inmate's body has been, by any objective measure, mutilated." The circuit court stated that "SCDC certainly anticipates similar carnage, as it created a firing squad chamber that includes a slanted trough below the firing squad chair to collect the inmate's blood and covered the walls of the chamber with a black fabric to obscure any bodily fluid or tissues that emanate from the inmate's body."

The circuit court also referenced Georgia's decision holding electrocution constitutes cruel and unusual punishment to support its determination that electrocution results in mutilation of the body and is, therefore, corporal. *See Dawson v. State*, 554 S.E.2d 137, 143 (Ga. 2001) (holding the electric chair violates the Georgia Constitution because the bodies of prisoners "are mutilated during the electrocution process" and that this mutilation occurs "whether or not the electrocution protocols are correctly followed and the electrocution equipment functions properly"); *id.* (stating the electric chair leaves prisoners' bodies "burned and blistered with frequent skin slippage from the process" and that "the brains of the condemned prisoners are destroyed in a process that cooks them at temperatures between 135 and 145 degrees Fahrenheit").

The State summarily argues all capital punishment is, inherently, "corporal," as it results in the death of the body, and capital punishment is allowed under our

state constitution, so Inmates cannot avail themselves of the constitutional protection against corporal punishment in this context.

As outlined earlier in this opinion, the ban on corporal punishment first appeared in the South Carolina Constitution of 1868, where it was located in the same article prohibiting "cruel and unusual punishment," but in a separate section. *See* S.C. Const. art. I, § 16 (1868). The 1895 Constitution reorganized the prohibitions and placed them together in one section. *See* S.C. Const. art. I, § 19 (1895). A later revision adopted the current phraseology, making each of the three terms independent, and placed them in article I, section 15. *See* S.C. Const. art. I, § 15 (stating "nor shall cruel, nor corporal, nor unusual punishment be inflicted").

Because corporal punishment is not defined in the state constitution, it is appropriate for courts to provide the necessary guidance. Our courts, however, have rarely had an occasion to address this aspect of the constitutional provision, as the prohibitions on cruel or unusual punishment are more commonly discussed. In addition, South Carolina's constitutional protection against corporal punishment appears to be unique among the states, so there is no comparable authority from other jurisdictions.

Initially, it is important to distinguish between what is often called judicial corporal punishment and student corporal punishment. It is readily apparent that there is a difference because, despite the ban on corporal punishment in the state constitution, South Carolina expressly and statutorily permits the corporal punishment of students in certain circumstances. However, such student corporal punishment must be reasonable in degree, and our statutory law provides "excessive corporal punishment" of a student can be deemed child abuse.[35]

In contrast, judicial corporal punishment, or what is traditionally termed corporal punishment as is used in article I, section 15 of our state constitution, has historically been understood to refer to physical punishment. *See generally Punishment (then Corporal Punishment), Black's Law Dictionary* (11th ed. 2019)

---

[35] *See* S.C. Code Ann. § 59-63-260 (2020) ("The governing body of each school district may provide corporal punishment for any pupil that it deems just and proper."); *cf. id.* § 63-7-20(6)(a)(i) (Supp. 2023) (stating "child abuse or neglect" or "harm" can result from "excessive corporal punishment," but excluding from the definition of corporal punishment certain physical punishment that "is reasonable in manner and moderate in degree" that is administered by a parent or person in loco parentis).

("Physical punishment; punishment that is inflicted on the body (including imprisonment).").

As is explained further in *Black's Law Dictionary*, corporal punishment includes physical punishment, such as mutilation and burning, and it is usually specified as a component of a defendant's sentence upon conviction for a criminal offense. From a legal standpoint, this is the definition of corporal punishment that perhaps sounds the most familiar in the context of punishment for criminal offenses:

> "Past forms of corporal punishment included branding, blinding, mutilation, amputation, and the use of the pillory and the stocks. It was also an element in such violent modes of execution as drowning, stoning, burning, hanging, and drawing and quartering . . . [.] In most parts of Europe and in the United States, such savage penalties were replaced by imprisonment during the late eighteenth and early nineteenth centuries, although capital punishment itself remained. Physical chastisement became less frequent until, in the twentieth century, corporal punishment was either eliminated as a legal penalty or restricted to beating with a birch rod, cane, whip, or other scourge. In ordinary usage the term now refers to such penal flagellation." Gordon Hawkins, "Corporal Punishment," in 1 *Encyclopedia of Crime and Justice* 251, 251 (Sanford H. Kadish ed., 1983).

*Id.* Corporal punishment is essentially the infliction of physical punishment causing pain upon the body for the commission of an infraction or a crime. *See Corporal Punishment*, *Encyclopedia Britannica*, https://www.britannica.com/topic/corporal-punishment (last updated May 25, 2024) ("[T]he infliction of physical pain upon a person's body as punishment for a crime or infraction. Corporal punishments include flogging, beating, branding, mutilation, blinding, and the use of the stock and pillory. In a broad sense, the term also denotes the physical disciplining of children in the schools and at home.").

The majority acknowledges that the term "corporal" has "never had a precise meaning" in relation to the term "punishment." The majority states it has, however, "quickly dispense[d] with the notion that any manner of carrying out the death penalty is corporal punishment." In doing so, it reasons (1) that corporal punishment was originally intended to reform or rehabilitate the prisoner subjected to the

punishment, and only that prisoner, citing 4 William Blackstone, *Commentaries on the Laws of England*, at 11–12 (1769); (2) a capital sentence does not share this goal of deterring future misconduct, as it is intended to result in the death of the offender; (3) therefore, no method of carrying out the death penalty can ever violate South Carolina's ban on corporal punishment. The majority also cites for support a case in which the Supreme Court of North Carolina criticized the drafters of a 1777 act governing prosecution costs and remarked that "the act was penned by a person totally ignorant of technical terms, for he thought capital punishment and corporal punishment were the same." *See State v. Lumbrick*, 4 N.C. 156, 157 (1814).

Although there is concededly a dearth of authority on this constitutional provision, I find none of the majority's citations compelling. For example, the majority assigns significance to the 1814 observation from the Supreme Court of North Carolina in *Lumbrick* that capital punishment and corporal punishment are not "the same," but this passing remark does not resolve the issue before this Court. It is clear that the meaning of the two terms are not synonymous, as corporal punishment is not the equivalent of a death sentence. In colloquial terms, a capital sentence could be deemed the "ultimate" corporal punishment, but this would be an oversimplification that obscures the true nature of Inmates' allegation.

In the current litigation, Inmates are not challenging the constitutionality of a capital sentence as punishment for a qualifying criminal offense. Nor are they arguing that a capital sentence violates South Carolina's constitutional prohibition against corporal punishment. Rather, Inmates are more narrowly alleging that two of the means currently set forth in section 24-3-530 for carrying out a capital sentence result in an inhumane level of mutilation to a prisoner's body, this Court and others have previously recognized that the mutilation of a prisoner is unconstitutional punishment, and the infliction of this inhumane mutilation is violative of our constitutional ban on corporal punishment.

The fundamental question before this Court then, as a matter of first impression, is whether the constitutional protection against corporal punishment is somehow suspended for only a singular class of South Carolina citizens—those who have received a capital sentence? In other words, may the State use any means for imposing a capital sentence, including mutilation, burning, or torture? I believe the answer must be no. The right of all citizens to be protected from corporal punishment—in short, the right to protection from physical abuse or torture at the hands of the State—does not cease to exist within the four walls of a prison for death row prisoners. The right was considered significant enough that it was enshrined in our constitution and given equal status with the prohibitions on cruel and unusual

punishment, so it should not be summarily "dispatched" with by this Court as to one category of citizens by engrafting an exception into our constitution that does not otherwise exist.

The North Carolina opinion cited by the majority consists of a scant paragraph that interprets North Carolina law concerning when the state shall be liable for prosecution costs. The North Carolina court commented on the inartful wording of the statute, interpreted the statute's meaning, and then concluded the state should pay the prosecution costs in that particular case.[36] Because the opinion does not actually involve a dispute about, or analysis of, corporal punishment or the death penalty, I do not find it persuasive on the question before this Court.

As to the remainder of the majority's analysis, while I do not doubt Blackstone's comment that corporal punishment can be intended to reform the prisoner by deterring future misconduct, I disagree that this comment from several centuries ago should define corporal punishment for all time and in all contexts. Notably, the element of deterrence exists for terms of imprisonment, corporal punishment, and the death penalty. Each punishment, including the death penalty, ostensibly serves as a warning of the potential consequences to others who disobey the law. *See generally State v. Shuler*, 353 S.C. 176, 189, 577 S.E.2d 438, 444 (2003) ("General deterrence arguments are admissible in the penalty phase of a capital trial."). Hence the historic use of punishments such as public stockades and public hangings, which result in death, also result in deterrence. The use of the punishment as deterrence, therefore, is not a dispositive factor.

In addition, for the constitutional protection to have any meaning, the existence of a capital sentence should not alter our consideration of the fundamental right that is at stake. Otherwise, it would effectively rewrite the state constitution to provide an exception to the ban on physical (i.e., corporal) punishment if the punishment to the body results in the death of the prisoner. Taken to its extreme, such an exception could be misused to apply to instances where a prisoner is punished severely and the government actor, either intentionally or due to extreme indifference, causes the death of the prisoner. Additionally, as some observers have

---

[36] The North Carolina court stated the legislature "did not intend to graduate offences," despite the wording of the statute, and it held the rule to be understood from "the act of 1777 [was] that in no case where the punishment extends to life, limb or member, can the court, on the acquittal of the defendant, order the prosecutor to pay costs," and "[i]n all other cases, it may be done, if the prosecution should appear to be frivolous or malicious." *Lumbrick*, 4 N.C. at 157.

noted, it is not logical to hold acts causing a high degree of bodily destruction, such as the intentional application of electric shocks to a prisoner, are illegal torture if used to coerce a confession, but allowable if they are used, on the other hand, to lead to the death of a prisoner who has received a capital sentence. The conduct should not be condoned in either instance.

I agree with the circuit court that setting a prisoner's body on fire during the process of electrocution and the firing squad's use of frangible ammunition to (as SCDC acknowledges) cause the utmost physical destruction to the body violate South Carolina's constitutional protection from corporal punishment. Acts such as setting a prisoner on fire and mutilation have long been recognized as improper corporal punishment, so there can be no dispute as to those points, and I see no justifiable basis for finding, as the majority does here, that such acts—while clearly banned for virtually all prisoners—are, nevertheless, somehow proper for a particular subset of prisoners. *See, e.g., State v. Brown*, 284 S.C. 407, 411, 326 S.E.2d 410, 412 (1985) (finding mutilation violates article I, section 15 of our state constitution); *Dawson v. State*, 554 S.E.2d 137, 143 (Ga. 2001) (holding the electric chair violates the Georgia Constitution because "the bodies of condemned prisoners in Georgia are mutilated during the electrocution process," even when done according to the required protocols). For the protections in our state constitution to have any efficacy and not be a mere illusion, our courts must be willing to recognize and apply them when appropriate, and I would do so here.

Lastly, I note that there can be some overlap between cruel punishment and corporal punishment. This overlap arguably existed in *Brown*, in which we found the trial judge erred in conditioning the suspension of a criminal sentence upon "voluntary" castration. In that case, several prisoners sought a mandamus, as they wanted to exercise this option in order to be released from prison. However, the Court found castration would constitute mutilation and was an unconstitutional punishment. We appeared to do so on the grounds it was cruel and/or unusual punishment. *See Brown*, 284 S.C. at 411, 326 S.E.2d at 412 ("Article I, § 15, of our Constitution prohibits the infliction of cruel and unusual punishment. Castration, a form of mutilation, is prohibited by Article I, § 15." (citations omitted)). Having found a violation existed on the independent ground(s) mentioned, the Court did not even discuss the existence of the prohibition against corporal punishment. There is no indication whether that ground was perhaps overlooked or ignored because there were already sufficient grounds for reversal, but I would take this opportunity to clarify *Brown* and to recognize the obvious—that egregious punishment that causes mutilation of the body clearly violates our ban against corporal punishment.

## V. Conclusion

I agree with the majority's determination that section 24-3-530 is not unconstitutional in its entirety. However, I disagree with the majority's failure to affirm the circuit court's determination that execution by electrocution and the firing squad violate our state's constitutional ban against cruel, corporal, or unusual punishment. Consequently, I concur in part and dissent in part.

**JUSTICE KITTREDGE**:  I concur in part and dissent in part.  I concur with Justice Few's well-reasoned majority opinion, with one exception: I would find the firing squad as a method of execution is "unusual" and, therefore, unconstitutional under article I, section 15 of the South Carolina Constitution.  *See* S.C. Const. art. I, § 15 (prohibiting cruel, unusual, or corporal punishments).

## I.

I begin with two threshold matters.  First, it is important to remember the Respondents-Appellants are four condemned inmates challenging the constitutionality of the methods of execution set forth in section 24-3-530 of the South Carolina Code (Supp. 2023), not the general constitutionality of the death penalty.  To be sure, the death penalty is constitutional in South Carolina; our state constitution directly refers to offenses punishable by death.  *See* S.C. Const. art. I, § 15 ("All persons shall be, before conviction, bailable by sufficient sureties, but bail may be denied to persons charged with *capital offenses . . . .*" (emphasis added)).  The question before us is narrow and revolves primarily around interpreting—and giving effect to—constitutional language.

Second, as to the lens through which I examine the constitutionality of section 24-3-530, and as set forth in the majority opinion, it is well-established that all statutes are presumed constitutional, and the challenger bears the heavy burden of establishing the unconstitutionality of a statute beyond a reasonable doubt.  *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999); *Y.C. Ballenger Elec. Cont'rs, Inc. v. Reach-All Sales, Inc.*, 276 S.C. 394, 397, 279 S.E.2d 127, 128 (1981).  This standard of review is a function of the separation of powers, for statutes generally reflect public policy decisions by the legislature to which the Court must defer unless their repugnance to the constitution is unquestionable.[37]  I have a profound respect for the separation of powers.  *See, e.g.*,

---

[37] *Cf. Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 475, 892 S.E.2d 121, 127 (2023) ("[T]he General Assembly's authority to legislate is plenary: the South Carolina Constitution grants power to the legislature to 'enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States.'" (quoting *Heslep v. State Highway Dep't*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933))); *Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision."); *Fripp v. Coburn*, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("[T]he Legislature may enact any law not prohibited by the Constitution.").

*Abbeville Cnty. Sch. Dist. v. State*, 410 S.C. 619, 663, 767 S.E.2d 157, 180 (2014) (Kittredge, J., dissenting); *Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 290, 882 S.E.2d 770, 825 (2023) (Kittredge, J., dissenting); *Planned Parenthood S. Atl.*, 440 S.C. 465, 892 S.E.2d 121. I have also not hesitated to declare an action of the legislature unconstitutional when so convinced beyond a reasonable doubt. *See, e.g.*, *Bd. of Trustees of Sch. Dist. of Fairfield Cnty. v. State*, 395 S.C. 276, 278, 718 S.E.2d 210, 211 (2011) (holding that the General Assembly's veto override votes fell short of the constitutionally required mandate).

Here, the details of effectuating the death penalty—like any other public policy decision—lie within the exclusive province of the legislature, comprised of the duly elected representatives of the citizens of South Carolina. Notwithstanding the legislature's plenary power, however, I find its inclusion of the firing squad in section 24-3-530 is unconstitutional beyond a reasonable doubt, for that method of execution constitutes an "unusual" punishment prohibited by article I, section 15 of the South Carolina Constitution.

## II.

Before addressing my disagreement with the majority, I emphasize there are a number of points on which I agree with the majority's thoughtful and comprehensive analysis. The majority thoroughly provides and explains the definitions of the terms "cruel" and "corporal" in our state constitution. For example, contrary to the condemned inmates' arguments, the majority is plainly correct that the prohibition on corporal punishment has no application in the death penalty setting, for it is, and has long been, a fundamentally different category of punishment than capital punishment. *See State v. Lumbrick*, 4 N.C. 156, 157 (1814) (explaining that conflating capital and corporal punishment reflects a "total ignorance of technical terms" (cleaned up)).

Likewise, the majority's detailed discussion of the historical understanding of the term "cruel" is excellent and dovetails with Justice Thomas's succinct explanation: certain ancient methods of punishment were readily identified as cruel because they were "purposely designed to inflict pain and suffering beyond that necessary to cause death." *Baze v. Rees*, 553 U.S. 35, 96 (2008) (Thomas, J., concurring). As the majority properly notes, the trial court made numerous findings regarding the alleged cruelty of each method of execution that are demonstrably incorrect, such as stating there was "*no* evidence to support the idea that electrocution produces an instantaneous or painless death." (Emphasis added).

## III.

I now come to the sole issue where I respectfully part company with my colleagues in the majority. I would find the firing squad unconstitutional on the narrow ground that it constitutes an "unusual" punishment within the meaning of article I, section 15 of our state constitution.

Article I, section 15 of the South Carolina Constitution houses our state's proscription against certain punishments, providing, in pertinent part, "Excessive bail shall not be required; nor shall excessive fines be imposed; *nor shall cruel, nor corporal, nor unusual punishment be inflicted . . . .*" S.C. Const. art. I, § 15 (emphasis added). The use of the disjunctive phrase "nor" between those three key terms is of great importance in resolving this constitutional challenge, for the use of the disjunctive phrase requires an independent inquiry into each term. More to the point, if any method of execution set forth in section 24-3-530 inflicts either "cruel" *or* "unusual" punishment, we must find it unconstitutional.[38]

Article I, section 15 is distinct from its federal counterpart. While our state constitution employs the disjunctive phrase, the Eighth Amendment contains the conjunctive phrase, requiring a form of punishment be both "cruel" *and* "unusual" to amount to one that is unconstitutional. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel *and* unusual punishments inflicted." (emphasis added)).

The State, with the majority following along, relies on language in decisions of the United States Supreme Court that seemingly approves of the firing squad as a constitutional method of punishment. That language does not control here. The difference, as described above, relates to the Eighth Amendment's use of the conjunctive phrase "cruel *and* unusual." The Supreme Court has never had to wrestle with whether the firing squad is an unusual punishment. Rather, members of the Supreme Court have addressed the firing squad in the context of the prohibition against cruel punishment. *See Wilkerson v. Utah*, 99 U.S. 130 (1879). Given the federal Constitution's use of the conjunctive phrase, once the Supreme Court determines a method of punishment, including the firing squad, does not constitute cruel punishment, it matters not whether the punishment is unusual. The

---

[38] As noted above, article I, section 15 likewise proscribes "corporal" punishment, demonstrating yet another distinction between our state constitution and the Eighth Amendment. However, again, the prohibition on corporal punishment has no application in this challenge to section 24-3-530.

inquiry ends there. Simply stated, the text of the South Carolina Constitution—specifically, the use of the disjunctive phrase—does not permit this Court to avoid addressing the independent prohibition against "unusual" punishment.

The majority mentions several of our cases that have tossed aside the clear textual distinction between article 1, section 15 and the Eighth Amendment, thereby treating our state provision as identical to its federal counterpart. I believe we must adhere to the language of the South Carolina Constitution and give meaning to the obviously deliberate choice to use the disjunctive phrase. I would overrule those prior decisions by this Court to the extent they have "interpreted"—or, in reality, rewritten—the South Carolina Constitution to prohibit "cruel *and* unusual punishments." *See*, *e.g.*, *State v. Wilson*, 306 S.C. 498, 413 S.E.2d 19 (1992); *State v. Brown*, 284 S.C. 407, 326 S.E.2d 410 (1985); *State v. Allen*, 266 S.C. 175, 222 S.E.2d 287 (1976), *vacated on other grounds*, 432 U.S. 902 (1977), *and overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

Because of article I, section 15's use of the disjunctive phrase, after concluding the firing squad is "unusual" in the constitutional sense, I need not reach the question of whether the firing squad constitutes "cruel" punishment. Nevertheless, I agree with the majority opinion in its conclusion that the firing squad is not "cruel" within the meaning of our state constitution—it is not "purposely designed to inflict pain and suffering beyond that necessary to cause death." *Baze*, 553 U.S. at 96 (Thomas, J., concurring).

## A.

In examining the firing squad as a method of punishment, the majority observes that section 24-3-530 will never *require* a condemned inmate's execution be effectuated by the firing squad, but instead will only subject a condemned inmate to this method if he exercises his statutory choice to die in this manner. My view of the constitutionality of the firing squad—or any method of execution—is not contingent upon whether it is the default statutory method or merely the method chosen by a condemned inmate. In my judgment, when the State administers any particular method of execution, that method must be constitutional lest the State take an active role in an unconstitutional action. While I recognize and appreciate the General Assembly's sincere effort to afford condemned inmates a choice in their fate, I disagree with any implication that shifting the choice of the method of execution from the State to the condemned inmate cleanses any unconstitutional stain from the method chosen.

**B.**

Examining whether the firing squad offends the article I, section 15 prohibition against unusual punishment first entails defining the constitutional meaning of the term "unusual."  After all, "[t]he interpretation of the constitution *necessarily* requires defining the meaning of its terms." *Baddourah v. McMaster*, 433 S.C. 89, 103, 856 S.E.2d 561, 568 (2021) (emphasis added).  I therefore set forth my understanding of the constitutional term "unusual," which informs my analysis and disposition of this constitutional challenge.

It is well settled that the state constitution is construed in light of its framers and the people who adopted it.  *Miller v. Farr*, 243 S.C. 342, 347, 133 S.E.2d 838, 841 (1963) (noting that our state constitution is construed in light of "the intent of its framers and the people who adopted it").  Therefore, we must look at the "ordinary and popular meaning of the words used"[39] and examine historical precedents to discern the intent of the framers when they proscribed "unusual" punishment in article I, section 15.

Because the prohibition against unusual punishment first appeared in our 1868 Constitution based upon similar language in the Eighth Amendment to the United States Constitution, we must attempt to discern the original meaning of the term "unusual" at the time of ratification of the Eighth Amendment.  As I set forth below, a careful study of founding-era sources reveals the constitutional term "unusual" refers to punishments that have largely fallen out of use—or have never been adopted—over a long period of time by virtue of their rejection by the citizens of a sovereign jurisdiction.

**C.**

Of course, everyone has a general sense of what the word "unusual" means in everyday discourse: uncommon, rare, out of the ordinary, or unused.  Our common, contemporary understanding of the word, however, does not fully encompass the legal, or constitutional, definition.  In the constitutional context, I believe the term "unusual" carries a more precise meaning.  In particular, the law concerning "unusual" punishment grafts an additional characteristic onto our common understanding of the word.

More specifically, the law concerning "unusual punishment" naturally emphasizes a

---

[39] *Richardson v. Town of Mount Pleasant*, 350 S.C. 291, 294, 566 S.E.2d 523, 525 (2002).

temporal component: for a punishment to be "unusual" in a constitutional sense, it must have either become largely unused over a long period of time or never been adopted despite being in existence for a long period of time. *Bucklew v. Precythe*, 587 U.S. 119, 130–31 (2019) (describing unusual punishments as ones that have fallen out of usage for a long period of time (citing John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1770–71, 1814 (2008) (citations omitted))).

Necessarily woven into the temporal component is the reason underpinning a certain punishment's long disuse. That reason is critical to the constitutional analysis, for it must signify a repudiation and permanent abandonment of the punishment; otherwise, mere disuse is, merely, disuse.[40] *See Glossip v. Gross*, 576 U.S. 863, 895 (2015) (Scalia, J., concurring) (opining that the term "unusual" does not include a mere decline in use, and any effort to so include it would constitute a "meaning[less] legal argument").

Accordingly, a punishment may properly be deemed "unusual" only when there is long disuse and that long disuse is fairly attributable to its rejection by the citizens of a state or nation. *Cf.* Stinneford, *supra*, at 1768–72, 1792–1815 (explaining that Americans in the late 18th and early 19th centuries described as "unusual" governmental actions that were not customarily-employed over a long period time, evincing those practices did not have the consent of the people). For example, although employed in the colonial era, brutal punishments historically used in England such as burning at the stake, drawing and quartering, and disembowelment fell out of use in the colonies by the middle of the eighteenth century, but they were not specifically banned in South Carolina. Nonetheless, in the centuries since, these methods have not been adopted or used in our state. There seems little doubt these methods of punishment would now be deemed "unusual" and prohibited under the South Carolina Constitution.[41] *See Bucklew*, 587 U.S. at 130 (listing historic methods of execution that "readily qualified as [both] 'cruel and unusual,' as a reader at the time of the Eighth Amendment's adoption would have understood those words

---

[40] Rarely will a state's repudiation of the punishment be expressed. Rather, it most often must be inferred by the history surrounding the use or lack of use of the punishment—including its origins and application to particular contexts.

[41] Similarly, dating back to the colonial era, hanging was once the leading method of execution in the United States. However, our state and the overwhelming majority of states across the nation have long abandoned hanging executions due to the citizenry's general disapproval of the method.

and, by the time of the founding, had long fallen out of use and so had become 'unusual'" (cleaned up)).

Thus, I find the article I, section 15 prohibition against "unusual" punishment applies to punishments—including methods of execution—that have been rejected by the people, as evidenced by disuse over a very long period of time.[42]

## D.

Having established the constitutional definition of the term "unusual," I find the firing squad violates the article I, section 15 proscription against such punishment. Plainly, a thorough historical review of the firing squad reveals its centuries-long, complete disuse in South Carolina may be fairly attributed to our state's rejection of the firing squad as a method of execution, just as we may say about a number of centuries-old methods of execution. Moreover, as explained below, the firing squad has seldom been used to execute condemned civilian inmates across the United States. In my judgment, the fact that a small minority of states have revived the firing squad as a method of execution in recent years cannot save section 24-3-530 from this constitutional challenge.

The firing squad has been an available method of execution since the dawn of our state, with the first documented firing-squad execution occurring in colonial America in 1608.[43] Nonetheless, until now, South Carolina has *never* authorized—let alone used—the firing squad as a method of execution. Necessarily, our state's deliberate, centuries-long failure to adopt firing-squad executions renders that method of execution "unusual" in the constitutional sense.

In explaining the complete absence of the firing squad from our state's history, the majority submits that "until the drugs necessary for lethal injection became unavailable in the years preceding the 2021 amendments to section 24-3-530," our state had "no occasion to consider alternative methods to electrocution and lethal injection." I view the situation differently. Over our 236 years of statehood, the

---

[42] The language prohibiting "unusual" punishment remained unchanged in the 1895 South Carolina Constitution and amendments to the state constitution in the early 1970s. There is no evidence the meaning of "unusual" has ventured from its original understanding.

[43] M. Watt Espy and John Ortiz Smykla, *Executions in the United States 1608–2002* (2002) (providing a historical database for executions in the Colonies, the territories, and the States from 1608–2002).

death penalty has been a sanctioned feature of South Carolina law, which reflects a policy judgment that is also embedded in our state constitution. In that time, our death penalty law has been the subject of numerous legislative enactments. At no time, however, has South Carolina sought to use—or to revive—the methods of execution that existed during colonial times, including the firing squad.[44] Instead, the State authorized and used hanging until 1912 when it abandoned that method of execution in favor of electrocution. Electrocution was our state's sole method of execution until the advent of lethal injection. At that point, believing it was less inhumane, the State substituted lethal injection as the default method of execution. Although electrocution remained as an alternative, lethal injection became the method of execution most commonly selected by condemned inmates. As the State explains in its brief, the recent amendments to section 24-3-530 resurrected the firing squad *only* because of the State's struggle to obtain the drugs necessary to carry out executions by way of lethal injection. But for that difficulty, the firing squad would have remained a relic of the past.

In examining the history surrounding firing-squad executions for civilian inmates, the firing squad has been largely abandoned since colonial times. Even in the last century, the firing squad has been rarely utilized. Only 3 of over 1,500 executions in the last the 50 years—less than 1% of recent civilian executions—were carried out by a firing squad. Significantly, all three of those firing-squad executions occurred in a single state, Utah. Utah's unique use of the firing squad has been often linked to its citizens' historic religious beliefs related to a condemned inmate repaying a blood debt. Deborah W. Denno, *The Firing Squad as "A Known and*

---

[44] The majority suggests the firing squad is not unusual because there is "absolutely no evidence the citizens of South Carolina in any way ever rejected the firing squad." If this were the standard for determining whether a method of execution was unusual in a constitutional sense, then presumably we should add other colonial-era methods of punishment to the list of punishments that are not unusual. The citizens of South Carolina, through their elected representatives, have never expressly disavowed, among other methods of punishment, the guillotine, burning at the stake, drawing and quartering, or disembowelment. Accepting the majority's framework for determining if a method of punishment is constitutionally unusual—"no evidence the citizens of South Carolina in any way ever rejected the firing squad"—these colonial-era and antiquated methods of punishment may be cruel, but they would not be unusual. In my judgment, these colonial-era methods of punishment are patently unusual in a constitutional sense. I respectfully reject the framework adopted by the majority.

*Available Alternative Method of Execution" Post-*Glossip, 49 U. Mich. J.L. Reform 749, 788 (2016).

Moreover, aside from Utah, no state has performed a firing-squad execution in the last century. In fact, looking back even as far as the colonial era, fewer than 145 firing-squad executions of the over 16,000 executions in our country's history—less than 1% of all civilian executions—have ever been carried out in territories that would eventually form our nation. Significantly, the federal government has never formally adopted or used the firing squad. To state the obvious, notwithstanding its availability, the firing squad has been largely rejected throughout our nation's history.[45]

The lack of civilian firing-squad executions both in our state and nationally is particularly notable given that, at one point in time, the firing squad was widely embraced by the military as punishment for soldiers guilty of desertion, mutiny, or other similar offenses. For example, during the American Civil War, 433 of the 573 soldiers executed were killed by firing squad. However, even at the zenith of military firing-squad executions, neither our state nor the nation have made any meaningful effort to adopt the firing squad as a method of executing civilians. Instead, over seventy years ago, it was the military that did an about-face and abandoned the firing squad, thus mirroring the civilian justice system.

To be clear, none of this historical discussion is intended to suggest new methods of effectuating a death sentence—such as lethal injection—should be considered "unusual" simply because they have never been tried before. Indeed, nothing in the text or history of article I, section 15 suggests the framers intended to inhibit innovative efforts to make executions less inhumane. The firing squad, however, is not a new method of execution.

Rather, until now, the firing squad has never been adopted or used in South Carolina, and its historical use throughout the nation has been almost nonexistent. Even the military—the principal proponent of the firing squad throughout our nation's history—has long since abandoned its use. Notwithstanding its availability since

---

[45] While four other states currently authorize the firing squad, each resorted to this antiquated method of execution for reasons similar to South Carolina, namely, the inability to obtain the lethal injection drugs. Indeed, the others states that authorize the firing squad all maintain lethal injection as their primary method of execution, employing the firing squad only if lethal injection and other authorized methods, if any, are held to be unconstitutional or otherwise unavailable.

colonial times, the firing squad has remained on the sidelines, leading to only one plausible conclusion: the firing squad is constitutionally "unusual," and the recent legislative introduction of the firing squad cannot stand.

## IV.

Unlike the United States Constitution that prohibits punishments that are both cruel *and* unusual, the South Carolina Constitution has a more stringent test. Our state constitution prohibits punishments that are either cruel *or* unusual. Because the firing squad is "unusual" within the meaning of article I, section 15 of the South Carolina Constitution, section 24-3-530 is unconstitutional insofar as it seeks to authorize the use of the firing squad. I otherwise join the majority's excellent opinion. Accordingly, I concur in part and dissent in part.